# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE: EL PASO PIPELINE PARTNERS,   )       C.A. No. 7141-VCL
L.P. DERIVATIVE LITIGATION         )

## OPINION

Date Submitted: September 3, 2015
Date Decided: December 2, 2015

Jessica Zeldin, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Jeffrey H. Squire, Lawrence P. Eagel, BRAGAR EAGEL & SQUIRE, PC, New York, New York; *Attorneys for Plaintiff.*

Peter J. Walsh, Jr., Brian C. Ralston, Berton W. Ashman, Jr., Matthew F. Davis, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Defendants El Paso Pipeline GP Company, L.L.C., El Paso Corporation, Douglas L. Foshee, John R. Sult, Ronald L. Kuehn, Jr., D. Mark Leland, Arthur C. Reichstetter, William A. Smith, and James C. Yardley.*

Lewis H. Lazarus, Thomas E. Hanson, Jr., Courtney R. Hamilton, Brett M. McCartney, MORRIS JAMES LLP, Wilmington, Delaware; *Attorneys for Nominal Defendant El Paso Pipeline Partners, L.P.*

**LASTER, Vice Chancellor.**

In November 2010, El Paso Corporation ("El Paso Parent") sold member interests in three limited liability companies to El Paso Pipeline Partners, L.P. (the "Partnership" or "El Paso MLP"). At the time of the sale, El Paso Parent controlled El Paso MLP through its ownership of El Paso Pipeline GP Company, L.L.C., the sole general partner of El Paso MLP (the "General Partner" or "El Paso GP"). On April 20, 2015, this court issued a post-trial decision which held that by causing El Paso MLP to buy the member interests, the General Partner breached the limited partnership agreement governing El Paso MLP (the "LP Agreement" or "LPA"). *See In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2015 WL 1815846 (Del. Ch. Apr. 20, 2015) (the "Post-Trial Opinion"). The Post-Trial Opinion referred to the transaction as the "Fall Dropdown," so this decision uses the same term. The Post-Trial Opinion held that the General Partner was liable for $171 million, plus pre- and post-judgment interest from the date of the transaction (the "Liability Award").

While the litigation was pending, Kinder Morgan, Inc. acquired El Paso Parent. After that transaction, Kinder Morgan owned 100% of the equity of El Paso Parent and therefore indirectly owned and controlled the General Partner. The acquisition did not affect the outstanding common units of El Paso MLP, which remained publicly traded. Kinder Morgan's acquisition of El Paso Parent therefore did not have any implications for the plaintiff's ability to pursue this litigation.

Shortly after trial, however, Kinder Morgan, El Paso Parent, El Paso MLP, and the General Partner consummated a related-party merger that brought an end to El Paso MLP's separate existence as a publicly traded entity (the "Merger"). The General Partner

1

moved to dismiss this litigation, contending that because the plaintiff styled his claim as derivative, the closing of the Merger meant that this case must be dismissed.

Granting the motion to dismiss would generate a windfall for the General Partner at the expense of the unaffiliated limited partners for whose indirect benefit this suit originally was brought. Kinder Morgan, El Paso Parent, El Paso MLP, and the General Partner disclosed in the proxy statement issued in connection with the Merger that the consideration paid for the common units did not attribute any value to this litigation. Assuming for purposes of analysis that the consideration fairly valued El Paso MLP's operating business, it did not provide any value for the non-operating asset that the Liability Award represented. If the General Partner is correct about how the law operates, then the limited partners never will receive any benefit from the Liability Award, and the General Partner will evade accountability for breaching the LP Agreement.

To the extent that Delaware law requires this court to choose between construing the cause of action that led to the Liability Award as either exclusively derivative or exclusively direct, then the breach of contract claim that supported the Liability Award is properly viewed as direct. The Merger therefore did not extinguish the plaintiff's standing to pursue the claim. This court can implement the Liability Award by permitting the limited partners at the time of the Merger who were not affiliated with the General Partner to receive their proportionate share of the $171 million.

The more appropriate way to view the cause of action that led to the Liability Award is as a dual-natured claim with aspects that are both derivative and direct. In my view, Delaware law can and should treat a dual-natured claim as derivative for purposes

2

of Rule 23.1 and the doctrine of demand, but as direct for purposes of determining whether sell-side investors can continue to pursue the claim after a merger. Treating a dual-natured claim as derivative for purposes of claim initiation achieves the important goals of screening out weak claims and providing an efficient and centralized mechanism for conducting the litigation. Treating a dual-natured claim as direct for purposes of claim continuation preserves the ability of investors to pursue legitimate claims, promotes accountability, and provides a superior mechanism for doing so than secondary litigation challenging the transaction that eliminated the plaintiff's standing to sue derivatively. In this case, the plaintiff's claim is best viewed as having a dual nature, so the plaintiff can continue to pursue it, and this court can implement the Liability Award through a *pro rata* recovery in favor of the limited partners at the time of the Merger who were not affiliated with the General Partner.

Contrary to the General Partner's arguments, the plaintiff is not estopped from enforcing the Liability Award through a *pro rata* recovery. It is true that the plaintiff described his claims as derivative until the Merger loomed on the horizon, but a plaintiff's description of his claims is not binding on the court. The General Partner therefore did not have any reliance interest in the plaintiff's description. Nor is the General Partner prejudiced by a characterization that permits *pro rata* recovery. Even if the claim supporting the Liability Award was derivative, substantial authority supports a court's ability to grant a *pro rata* recovery on a derivative claim. Such a recovery is the exception, not the rule, but it is possible. The General Partner therefore cannot claim prejudice from a form of relief that it could have faced in any event. And estoppel would

3

be inequitable on these facts. The General Partner and its affiliates triggered the need for a different characterization by engaging in the related-party merger. The General Partner cannot legitimately complain about a response to action that Kinder Morgan took.

The General Partner's motion to dismiss is therefore denied.

## I.       FACTUAL BACKGROUND

The Post-Trial Opinion made findings of fact on which this decision relies. This decision also relies on a limited number of publicly available documents relating to the Merger that the parties submitted. No one has disputed the accuracy of the documents for purposes of the issues raised by the motion.

### A.       El Paso Parent, El Paso MLP, And The General Partner In November 2010

At the time of the Fall Dropdown, El Paso Parent was a Delaware corporation whose shares of common stock traded on the New York Stock Exchange under the symbol "EPC." Headquartered in Houston, El Paso Parent focused on the exploration, production, and transmission of natural gas.

At the time of the Fall Dropdown, El Paso MLP was a Delaware limited partnership controlled by El Paso Parent. El Paso MLP's limited partner interest was divided into common units that traded on the New York Stock Exchange under the symbol "EPB." Through the General Partner, El Paso Parent owned all of El Paso MLP's general partner interest, representing a 2% economic interest in El Paso MLP. El Paso Parent also owned approximately 52% of El Paso MLP's common units and all of its incentive distribution rights ("IDRs"). The IDRs were a class of non-voting units

4

authorized by the LP Agreement that gave El Paso Parent a preferential claim to El Paso MLP's cash flows.

At the time of the Fall Dropdown, El Paso Parent exercised *de jure* control over El Paso MLP through the General Partner. El Paso Parent also exercised *de facto* control over El Paso MLP because the Partnership had no employees of its own. Employees of El Paso Parent managed and operated its business.

The composition of the General Partner's board of directors (the "GP Board") reflected El Paso Parent's control. At the time of the Fall Dropdown, the members of the GP Board were Douglas L. Foshee, D. Mark Leland, James C. Yardley, John R. Sult, Ronald L. Kuehn, Jr., William A. Smith, and Arthur C. Reichstetter. Foshee, Leland, Yardley, and Sult held senior management positions with El Paso Parent. Yardley served as the General Partner's President and CEO. Sult served as its CFO. Kuehn, Smith, and Reichstetter were outside directors who, as required by the LP Agreement, met the independence standards for service on the audit committee of a NYSE-listed corporation.

## B.    The Fall Dropdown And The Conflict-Of-Interest Provision

In October 2010, El Paso Parent proposed the Fall Dropdown. Because El Paso Parent controlled El Paso MLP through its ownership of the General Partner and also owned the interests that El Paso MLP would acquire, the Fall Dropdown created a conflict of interest for the General Partner. The LP Agreement established contractual requirements for such a transaction.

As authorized by the Delaware Revised Uniform Limited Partnership Act (the "LP Act"), the LP Agreement eliminated all common law duties, including fiduciary duties,

5

that the General Partner, El Paso Parent, or the members of the GP Board otherwise might owe to El Paso MLP and its limited partners. LPA § 7.9(e). In place of common law duties, the LP Agreement substituted contractual commitments.

Section 7.9(a) of the LP Agreement established contractual requirements for any decision made by the General Partner that involved a conflict of interest. It stated:

> [W]henever a potential conflict of interest exists or arises between the General Partner . . . , on the one hand, and the Partnership . . . , any Partner or any Assignee, on the other, any resolution or course of action by the General Partner . . . in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement, . . . or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Outstanding Common Units (excluding Common Units owned by the General Partner and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).

LPA § 7.9(a) (the "Conflict-of-Interest Provision").[1]

Under the Conflict-of-Interest Provision, if the General Partner took action that involved a conflict of interest, then the action would be "permitted and deemed approved by all Partners" and "not constitute a breach" of the LP Agreement or "any duty stated or

---

[1] For decisions discussing the Conflict-of-Interest Provision at greater length, see *Allen v. El Paso Pipeline GP Co., L.L.C.*, 90 A.3d 1097, 1100-03 (Del. Ch. 2014); *In re El Paso Pipeline P'rs Deriv. Litig.*, 2014 WL 2768702, at \*3-4, \*9-13 (Del. Ch. June 12, 2014); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 173-74, 178-182 (Del. Ch. 2014), *aff'd,* --- A.3d ---, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE).

implied by law or equity" as long as the General Partner proceeded in one of the four contractually specified ways. *Id.* If the General Partner did not satisfy the Conflict-of-Interest Provision by taking one of the contractually specified routes, then the General Partner would breach the LP Agreement.

## C.    The General Partner Opts To Proceed By Special Approval.

For purposes of the Fall Dropdown, the General Partner opted to proceed by way of Special Approval. The LP Agreement defined Special Approval as "approval by a majority of the members of the Conflicts Committee acting in good faith." LPA § 1.1. The LP Agreement in turn defined the Conflicts Committee as

> a committee of the Board of Directors of the General Partner composed of two or more directors, each of whom (a) is not a security holder, officer or employee of the General Partner, (b) is not an officer, director or employee of any Affiliate of the General Partner, (c) is not a holder of any ownership interest in the Partnership Group other than Common Units and awards that may be granted to such director under the Long Term Incentive Plan and (d) meets the independence standards required of directors who serve on an audit committee of a board of directors established by the Securities Exchange Act and the rules and regulations of the Commission thereunder and by the National Securities Exchange on which the Common Units are listed or admitted to trading.

*Id.*

At El Paso MLP, the Conflicts Committee was not a standing committee of the GP Board, but rather an *ad hoc* committee constituted to consider specific transactions. For the Fall Dropdown, the members of the Conflicts Committee were Kuehn, Smith, and Reichstetter (the "Committee").

On November 8, 2010, representatives of El Paso Parent and the Committee reached a tentative agreement on the terms of the Fall Dropdown. On November 12, the

7

Committee approved the transaction. El Paso Parent announced the Fall Dropdown on November 15, 2010. It closed shortly thereafter.

## D.  Brinckerhoff Sues.

On March 6, 2012, plaintiff Peter R. Brinckerhoff filed a lawsuit challenging the Fall Dropdown. Brinckerhoff styled his complaint as a Verified Derivative Complaint (the "Complaint"). Consistent with its title, the first paragraph of the Complaint stated that Brinckerhoff brought the action "derivatively on behalf of [El Paso MLP]." Compl. ¶ 1. The pleading contained allegations to establish demand futility, a subject that is only relevant to a derivative claim.

Brinckerhoff's core theory was that "the Partnership was injured" when the defendants caused El Paso MLP to pay too much for the member units that El Paso Parent sold to it. *Id.* ¶ 7. Brinckerhoff sued not only the General Partner but also El Paso Parent and the members of the GP Board. The Complaint included four counts that alleged claims for breaches of express and implied duties of the LP Agreement, aiding and abetting the alleged breaches of duties, tortious interference, and unjust enrichment. The Complaint's prayer for relief focused on remedies that would benefit the Partnership. The pleading sought a judgment (i) ordering defendants to account to the Partnership for its damages as a result of the alleged harm, (ii) directing El Paso Parent to "disgorge and make restitution" to the Partnership of the unjust enrichment it had received at the Partnership's expense, and (iii) reforming the terms of the documents governing the Fall Dropdown or, alternatively, awarding rescissory damages to the Partnership. *See id.* ¶¶ 32-33.

8

**E. Kinder Morgan Acquires El Paso Parent.**

In September 2010, while this litigation was pending, Kinder Morgan offered to purchase all of the outstanding common stock of El Paso Parent for $16.50 per share. *See In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 435 n.4 (Del. Ch. 2012) (Strine, C.). El Paso Parent rejected that offer. In August 2011, negotiations resumed after Kinder Morgan offered to acquire El Paso Parent for a combination of cash and stock valued at $25.50 per share. On October 16, 2011, El Paso Parent and Kinder Morgan entered into a merger agreement. Each share of El Paso Parent common stock was converted into the right to receive cash, Kinder Morgan stock, or a combination of cash and Kinder Morgan stock worth $25.91, plus a warrant for Kinder Morgan stock with a strike price of $40. The transaction closed on May 24, 2012.

The merger brought an end to El Paso Parent's status as a separately traded public entity. El Paso MLP, however, continued to trade as a public entity after the merger closed.

**F. The Summary Judgment Ruling**

In October 2013, after the close of discovery, the parties filed cross-motions for summary judgment. In support of his motion, Brinckerhoff argued that the Partnership had suffered damages "measured by the difference between the price [the General Partner] had [the Partnership] pay . . . and those assets' fair value." Dkt. 158 at 27. To establish damages, Brinckerhoff relied on an expert who opined that the Partnership overpaid for the member interests and sustained damages as a result.

The court denied the plaintiff's motion and granted the defendants' motion except for one claim against one defendant. The only surviving claim was against the General Partner for breach of the LP Agreement. *In re El Paso Pipeline P'rs L.P. Deriv. Litig.*, 2014 WL 2641304 (Del. Ch. June 12, 2014) (ORDER). On July 11, 2014, Brinckerhoff moved pursuant to Court of Chancery Rule 54(b) for the entry of an appealable final order as to the issues on which the court ruled in favor of the defendants.

## G.    Kinder Morgan Announces The Merger.

On August 10, 2014, Kinder Morgan and El Paso MLP announced the Merger. The transaction was one part of a larger reorganization designed to simplify the corporate structure of the Kinder Morgan family of companies. Before the Merger, Kinder Morgan and three of its subsidiaries had issued equity securities that traded on public markets. After the Merger, Kinder Morgan would be the only publicly traded entity. According to the announcement, each common unit of El Paso MLP would be converted through the Merger into the right to receive (i) 0.9451 shares of Kinder Morgan common stock plus $4.65 in cash, (ii) 1.0711 shares of Kinder Morgan common stock, or (iii) $39.53 in cash. Kinder Morgan and El Paso MLP stated in their announcement that they expected the transaction to close by the end of 2014.

On August 13, 2014, Brinckerhoff withdrew his Rule 54(b) motion. On August 22, Brinckerhoff asked the court to schedule trial before the anticipated closing of the Merger. Anticipating that the defendants would argue that the Merger deprived the limited partners of standing to sue, Brinckerhoff posited that he could recast his remaining cause of action as a direct claim because it asserted that the General Partner

10

had breached the LP Agreement by failing to comply with the Conflict-of-Interest Provision.

The General Partner opposed the motion and sought to defer any trial until after the Merger closed. The General Partner contended that the closing of the Merger would terminate the litigation, rendering a trial unnecessary. The General Partner asked for a definitive determination that Brinckerhoff's sole remaining claim was derivative, belonged to El Paso MLP, and would pass to Kinder Morgan as a matter of law upon the closing of the Merger.

During a hearing on September 9, 2014, I deferred any decision as to whether the remaining claim for breach of the LP Agreement was derivative or direct. To my mind, answering that question involved challenging legal issues, which this court would not need to address if the General Partner prevailed at trial. If the court had to consider the matter, then a post-trial ruling could be made on a developed factual record. I therefore declined to make a pre-trial determination as to the nature of the breach of contract claim.

## H.    The Proxy Statement For The Merger

On October 22, 2014, El Paso MLP filed its definitive proxy statement for the Merger (the "Proxy Statement"). The section describing the background of the Merger revealed that Kinder Morgan began considering a corporate reorganization in May 2014. On July 10, Kinder Morgan proposed a meeting with the members of the GP Board who qualified as independent directors under the NYSE rules. When the meeting took place one week later, Kinder Morgan proposed acquiring El Paso MLP through a merger in which each outstanding common unit would be converted into the right to receive $4.65

11

in cash and 0.9337 Kinder Morgan shares. The proposed consideration represented a 10% premium to the closing price of the common units on July 16.

Kinder Morgan's proposal presented a conflict of interest for the General Partner and therefore implicated the Conflict-of-Interest Provision. The General Partner opted to proceed by way of Special Approval. The GP Board formed a Conflicts Committee comprising Kuehn, Reichstetter, and Smith (the "Merger Committee"). They were the same individuals who comprised the Committee for the Fall Dropdown. The Merger Committee also retained the same financial advisor that advised the Committee on the Fall Dropdown.

The Merger Committee did not seek value for the breach of contract claim at issue in this litigation, and the Proxy Statement made clear that the consideration provided in the Merger did not incorporate any value for the claim. The Merger Committee did not consider this lawsuit at all until the day before they voted to approve the Merger, after the consideration had been set. No third-party analysis or valuation of claims was undertaken. The Merger Committee assumed that the claims would be "extinguished as a result of the [Merger]" and regarded their value as "not sufficiently material" as to "merit adjustments to the [El Paso MLP] merger consideration or otherwise affect the determinations made by the [Merger Committee] with respect to the [Merger]." Proxy Statement at 45-46.

I.    **The Trial**

Trial was held November 12, 13, and 17, 2014. Both sides presented evidence and adduced expert testimony directed to whether the General Partner satisfied its contractual

duty in the Fall Dropdown and, if not, how El Paso MLP was harmed. Brinckerhoff focused on proving damages by showing that El Paso MLP overpaid in the Fall Dropdown, and the General Partner sought to rebut that theory. The parties did not present evidence at trial regarding specific harm to the unaffiliated limited partners.

## J.     The Merger Closes.

On November 20, 2014, El Paso MLP held a special meeting of its unit holders to consider the Merger. Kinder Morgan and El Paso MLP solicited proxies in favor of the Merger. The Merger was not conditioned on the affirmative vote of holders of common units unaffiliated with Kinder Morgan or the General Partner. The Merger only required the approval of holders of a majority of the Partnership's outstanding common units. Kinder Morgan and its affiliates (including the General Partner) controlled 40.2% of the Partnership's outstanding common units. The Merger received the necessary vote. The transaction closed on November 26, 2014.

At the effective time, El Paso Parent owned all of El Paso MLP's general partner interest through the General Partner, representing a 2% economic interest in El Paso MLP. El Paso Parent's affiliates, including Kinder Morgan and the General Partner, owned a total of 93,380,734 common units. Members of the GP Board held another 353,732 common units. There were 233,151,329 total common units outstanding at the time of the Merger, meaning that 139,416,863 common units were owned by limited partners who were not affiliated with the General Partner. The limited partners who were not affiliated with the General Partner owned, in the aggregate, 59.8% of the common units that comprised the 98% limited partner interest in El Paso MLP. The limited

partners who were not affiliated with the General Partner thus owned, in the aggregate, a 58.6% partnership interest in El Paso MLP. Kinder Morgan and its affiliates (including the General Partner) owned, in the aggregate, 40.2% of the common units that comprised the 98% limited partner interest in El Paso MLP, plus all of the 2% general partner interest. Kinder Morgan and its affiliates (including the General Partner) thus owned, in the aggregate, a 41.4% partnership interest in El Paso MLP. *See* Appendix A.

After the Merger, El Paso MLP continued temporarily as a wholly owned subsidiary of Kinder Morgan. On December 31, Kinder Morgan merged El Paso MLP into another Kinder Morgan-controlled entity, Kinder Morgan Energy Partners, L.P. ("KM Partners"). On the same date, Kinder Morgan merged the General Partner with and into KM Partners. As a result of these mergers, KM Partners is now the successor both to (i) El Paso MLP's right to recover against the General Partner under the Post-Trial Opinion, and (ii) the General Partner's liability for the $171 million, plus pre- and post-judgment interest, imposed by the Post-Trial Opinion.

## K.     The Renewed Motion To Dismiss

On December 2, 2014, the General Partner moved to dismiss Brinckerhoff's claims on the ground that the claims were exclusively derivative. The General Partner asserts that Brinckerhoff lost standing to pursue his claims as a result of the Merger, necessitating dismissal of this litigation.

## II.     LEGAL ANALYSIS

The Delaware Supreme Court has held that a cause of action belonging to a corporation is a corporate asset that passes in a merger to the surviving entity. *Lewis v.*

14

*Anderson*, 477 A.2d 1040, 1050 n.19 (Del. 1984). Where, as here, the surviving entity emerges as a wholly owned subsidiary of another entity, the litigation asset comes under the control of the new parent. *See Lambrecht v. O'Neal*, 3 A.3d 277, 288 (Del. 2010). If stockholders were pursuing a corporate claim derivatively at the time of the merger, then the merger extinguishes the former derivative plaintiffs' standing to sue. *See Lewis v. Ward*, 852 A.2d 896, 900-901 (Del. 2004). By contrast, if the stockholders were pursuing an individual claim directly at the time of the merger, then the claim belonged to them, and they did not lose standing to sue. Under this legal framework, "the question of whether the plaintiffs' claims are individual or derivative becomes outcome determinative. If the claims are individual, the plaintiffs' claims survive the merger. If not, the plaintiffs' claims are extinguished." *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 82 (Del. Ch. 1999) (Strine, V.C.).

As the General Partner sees it, the claim that led to the Liability Award was exclusively derivative and belonged to El Paso MLP. Consequently, once the Merger closed, control over the claim passed to an affiliate of the General Partner, extinguishing Brinckerhoff's standing to sue. Eventually, through subsequent transactions, both the ownership of the claim and the responsibility for paying it became united in a single entity: KM Partners. That entity obviously has no interest in enforcing the Liability Award against itself.

Under the General Partner's view of the world, it does not matter that Brinckerhoff proved at trial that the General Partner breached its contractual obligations under the LP Agreement. Nor does it matter that by breaching the LP Agreement, the General Partner

15

shortchanged the Partnership by $171 million and conferred an unwarranted benefit on El Paso Parent in the same amount. It also does not matter that the Merger attributed no value to that claim. Brinckerhoff and the other unaffiliated limited partners in El Paso MLP are out of luck. Because a related-party merger closed before a final judgment could be entered and enforced, the General Partner owes nothing and the unaffiliated limited partners get nothing.

Events unfold differently if Brinckerhoff's claim for breach of contract is direct. In that case, the claim belongs to Brinckerhoff and the limited partners as a group, and they did not lose standing to sue. Ownership of the claim did not pass in the Merger to the surviving entity. Only the liability for the claim passed to KM Partners as the successor to the General Partner. In that case, Brinckerhoff and the other unaffiliated limited partners in El Paso MLP are not out of luck. Each can enforce against KM Partners a right to a *pro rata* share of the Liability Award.

The General Partner contends that this court must choose between two exclusive alternatives by categorizing the claim that supported the Liability Award as either derivative or direct. If Delaware law requires that stark choice, then this decision concludes that the claim was direct. Brinckerhoff proved that the General Partner violated the LP Agreement, which is a contract to which Brinckerhoff and the other limited partners were parties. They were and remain entitled to enforce the terms of that agreement. *See infra* Part II.A.

But there is a more nuanced reason why Brinckerhoff and the limited partners are not out of luck. Contrary to the General Partner's bipolar mindset, Delaware law does not

16

only regard claims as either exclusively derivative or exclusively direct. The Delaware Supreme Court has recognized that some claims have features of both categories, and the high court has held that when both features are present, a plaintiff can litigate either type of claim. When reviewing strong claims involving insider transfers and other conduct that traditionally fell within the rubric of the duty of loyalty, the Delaware Supreme Court has used the dual characterization to allow plaintiffs to continue to litigate after a merger. I believe that the claim that supported the Liability Award is best understood as having dual aspects such that Brinckerhoff can continue to litigate his claim. *See infra* Part II.B.

Candor demands conceding that the decisions in which the Delaware Supreme Court has recognized dual-natured claims have been controversial and stand in tension with other decisions that have characterized similar claims as purely derivative.[2] In my

---

[2] In recent memory, two notable Delaware Supreme Court decisions to deploy the dual characterization have been *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006), and *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319 (Del. 1993). In *Gentile*, the Delaware Supreme Court held that a dilutive stock issuance to a controlling stockholder gave rise to dual injury such that the plaintiff could continue litigating the claim. In *Tri-Star*, to the same effect, the Delaware Supreme Court held that an insider transfer gave rise to dual injury. The high court's analysis in both cases differed from and was more nuanced than decisions which have held for purposes of Rule 23.1 that similar injuries gave rise to purely derivative claims. *See, e.g., Ryan v. Gursahaney*, 2015 WL 1915911, at *9-10 (Del. Ch. Apr. 28, 2015) (characterizing overpayment claim as derivative for purposes of Rule 23.1 where company selectively bought back stock from hedge fund with board representation); *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *25 (Del. Ch. Sept. 30, 2013) (treating overpayment claim as derivative for purposes of Rule 23.1); *In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 259-60 (Del. Ch. 2006) (treating overpayment claim in which company repurchased preferred stock from controlling shareholder as derivative for purposes of Rule 23.1); *In re Paxson Commc'n Corp. S'holders Litig.*, 2001 WL 812028, at *5 (Del. Ch. July 12, 2001) (characterizing injury from stock issuance claim as derivative for purposes of Rule 23.1 and asserting that "to the extent

view, the tension arises because Delaware law uses a singular inquiry—characterizing a claim as derivative or direct—in two starkly different litigation contexts. The first scenario regularly arises at the outset of a case when a court must determine whether a claim is subject to a heightened pleading standard under Rule 23.1 and the substantive doctrine of demand. At that stage, framed in the language of corporations, the principal public policy in play is board centrism.[3] Directors—not stockholders—manage and oversee the business and affairs of the corporation, and the board's authority includes decisions about whether or not to bring litigation.[4] Not surprisingly, and for good reason, this policy leads to more expansive characterizations of actions as derivative rather than direct. In a close case, it makes sense for the law to err on the side of giving the board of directors the benefit of the doubt and control over litigation assets. If the claim is strong,

that any alleged decrease in the asset value and voting power of plaintiffs' shares . . . results from the issuance of new equity. . . , plaintiff's dilution theory as a basis for a direct claim fails"); *Leung v. Schuler*, 2000 WL 264328, at *7 (Del. Ch. Feb. 29, 2000) (characterizing a claim challenging a dilutive stock issuance to insiders as derivative for purposes of Rule 23.1).

[3] To date, the bulk of the precedents analyzing the difference between direct and directive claims have involved corporations. El Paso MLP was a limited partnership. This decision strives to use the language of limited partnerships or entity-neutral terminology, but from time to time it necessarily deploys (or lapses into) corporate parlance by referring to stockholders, boards of directors, and corporations.

[4] *See* 8 *Del. C.* § 141(a); *Braddock v. Zimmerman*, 906 A.2d 776, 784 (Del. 2006) ("The demand requirement of Rule 23.1 is a substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise." (internal quotation marks omitted)); *South v. Baker*, 62 A.3d 1, 13-16 (Del. Ch. 2012) (discussing relative roles of board and stockholders when corporation has suffered injury).

it typically will survive a Rule 23.1 analysis regardless. Similar policies apply to limited

partnerships, where a general partner manages the entity.[5]

---

[5] The LP Act does not contain a provision analogous to Section 141(a) of the DGCL that succinctly establishes a principle of general partner centrism. Nevertheless, a combination of provisions in the LP Act lead ineluctably to that conclusion. Section 17-403(a) states that "[e]xcept as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the rights and powers and is subject to the restrictions of a partner in a partnership that is governed by the Delaware Uniform Partnership Law." 6 *Del. C.* § 17-403(a); *see also Kansas RSA 15 Ltd. P'ship v. SBMS RSA, Inc.*, 1995 WL 106514, at *2 (Del. Ch. Mar. 8, 1995) (Allen, C.) (stating that a limited partnership's "general partner's powers are the same as those of [] partners of a general partnership"). The Delaware Uniform Partnership Law states that (i) "[e]ach partner is an agent of the partnership for the purpose of its business, purposes or activities," 6 *Del. C.* § 15-301, and (ii) "has equal rights in the management and conduct of the partnership business and affairs," *id.* § 15-401(f). There is no analogous source of authority for limited partners. Instead, Section 17-303 of the LP Act states that limited partners only can maintain their limited liability if they refrain from participating in the management of the partnership. *Id.* § 17-303. Moreover, unless the limited partnership agreement eliminates fiduciary duties, the general partner of a Delaware limited partnership owes fiduciary duties to the partnership and the limited partners, which functionally recognizes that the general partner manages the partnership on behalf of the limited partners. *See* Paul M. Altman & Srinivas M. Raju, *Delaware Alternative Entities and the Implied Contractual Covenant of Good Faith and Fair Dealing Under Delaware Law,* 60 Bus. Law. 1469, 1470 (2005) (noting that general partners owe fiduciary duties to the limited partnership and its limited partners because they control the partnership's property for the benefit of the partnership and its limited partners). As the leading treatise on Delaware limited partnerships observes,

> [t]ypically, the general partners conduct the day-to-day business and affairs of the limited partnership and are involved in controlling the management of the limited partnership's business. Generally a limited partner does not participate in the control of the business of the partnership, but rather invests money or other property in the limited partnership in exchange for certain economic rights (including the right to participate in the profits of the business venture). In addition, under the Act, limited partners may possess certain voting and informational rights.

19

The second context is the one presented by this case, where a merger has terminated the separate legal existence of the entity on whose behalf the derivative action was pursued.[6] In contrast to a Rule 23.1 analysis, where strong claims typically proceed notwithstanding a derivative characterization, *Lewis v. Anderson* operates as a bright-line, one-size-fits-all rule that effectively terminates claims regardless of merit. As Chief Justice Strine observed while a Vice Chancellor, although courts "may indulge the notion that [derivative] claims [against officers and directors] still 'survive' [after a merger] . . . , they usually die as a matter of fact." *Golaine v. Edwards*, 1999 WL 1271882, at \*4 (Del. Ch. Dec. 21, 1999). Not surprisingly, with this consequence looming, decisions rendered

---

Martin I. Lubaroff & Paul M. Altman, Delaware Limited Partnerships § 1.2 (Supp. 2015); *accord* Edwin W. Hecker, Jr., *Limited Partners' Derivative Suits Under The Revised Uniform Limited Partnership Act*, 33 Vand. L. Rev. 343, 344 (1980) ("As is the case with publicly held corporations, ownership is separated from control in the modern limited partnership. . . . Unlike corporations, however, this separation results not only from the dispersion of ownership . . . but also from the theoretical of nature of a limited partnership. By definition, a limited partner is a passive investor.").

[6] By statute, when a merger becomes effective, "for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others . . . have been merged, as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations." 8 *Del. C.* § 259(a). The same is true for limited partnerships. *See* 6 *Del. C.* § 17-211(b). In some direct mergers and all reverse-triangular mergers, the acquired corporation continues as the surviving corporation. For purposes of the issues discussed in the opinion, however, the *separate* existence of the entity ceases. In a direct merger, the two firms merge, and although the one may survive, the post-transaction entity represents a consolidation of the two merged firms. Likewise in a reverse-triangular merger, although the entity survives, it emerges as a wholly owned subsidiary of the acquirer. *See Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1205-06 (Del. Ch. 2010).

in this context have tended to find ways to characterize strong claims as direct. This impetus has led to decisions parsing the derivative-versus-direct distinction in the context of mergers that are difficult to reconcile.[7] In my view, it also led to the recognition of dual-natured claims.

For present purposes, it would be enough to hold that Brinckerhoff has asserted a dual-natured claim that he can continue to litigate after the Merger. But in light of the doctrinal tensions that presently exist regarding how the injuries from similar transactions are characterized, this decision takes the liberty of suggesting a further development in how our law addresses dual-natured claims.[8] In my view, Delaware law should split the atom of its now-unitary analysis. Delaware law can and should treat dual-natured claims

---

[7] *Compare, e.g., Parnes v. Bally Entm't Corp.*, 722 A.2d 1243 (Del. 1999) (holding that challenge to side payments to management in connection with a merger was direct) *with Kramer v. Western Pac. Indus. Inc.*, 546 A.2d 348 (Del. 1988) (holding that challenge to grant of stock options and golden parachutes to management prior to a merger was derivative) *with Elster v. Am. Airlines, Inc.*, 100 A.2d 219, 222 (Del. Ch. 1953) (holding that challenge to option grants stated derivative claim for mismanagement of stock as a corporate asset); *see Agostino v. Hicks*, 845 A.2d 1110, 1118-22 (Del. Ch. 2004) (describing tension); *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 76 (Del. Ch. 1999) (Strine, V.C.) (same).

[8] This aspect of this decision is admittedly dictum, but because this decision effectively decides the fate of the Liability Award, the losing party can be expected to appeal. It therefore seems likely that the Delaware Supreme Court will be presented with the issue and, given that reality, it seemed beneficial to touch on an issue relevant to Delaware's continued recognition of dual-natured claims. This approach is also consistent with precedents in which members of this court, who must wrestle regularly with the derivative-versus-direct distinction, have made suggestions for clarifying this area of the law. *See, e.g.*, *Agostino*, 845 A.2d at 1121-22; *Gaylord*, 747 A.2d at 77-83; *Golaine*, 1999 WL 1271882, at *4-7.

differently for purposes of claim initiation, when Rule 23.1 and the demand doctrine should apply, and claim termination, when the plaintiff should be able to continue to litigate a dual-natured cause of action post-merger as a direct claim. *See infra* Part II.B.3. Just as the framers of our federal constitution resolved difficult issues of national polity by "split[ing] the atom of sovereignty,"[9] so too can the members of the Delaware Supreme Court, as framers of the equitable parameters of entity law, resolve difficult issues of entity polity using a similar technique.[10]

Finally, the decision considers whether estoppel should bar Brinckerhoff from characterizing his claim as anything other than derivative. The grounds for estoppel are lacking. A court is not bound by whether a plaintiff describes its claim as derivative or direct, so the General Partner did not have a reliance interest in Brinckerhoff's derivative characterization. *See infra* Part II.C.1. The General Partner also is not prejudiced from an order that implements the Liability Award through a *pro rata* recovery by unaffiliated limited partners. Although it is rare for a court to grant an investor-level recovery on an

---

[9] *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 838 (1995) (Kennedy, J., concurring) ("Federalism was our Nation's own discovery. The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal . . . ."); *see* Randy J. Holland, *State Constitutions: Purpose and Function*, 69 Temp. L. Rev. 989, 992 (1996) (quoting *Term Limits* and describing implications of dual sovereignty).

[10] *See Schoon v. Smith*, 953 A.2d 196, 204 (Del. 2008) ("The judicial creation of equitable standing for a stockholder to bring a derivative action demonstrates that equitable doctrine can be judicially extended to address new circumstances."). "Judicially-created equitable doctrines may be extended so long as the extension is consistent with the principles of equity." *Id.* at 205.

entity-level claim, ample authority establishes that such a remedy is possible. *See infra* Part II.C.2. The General Partner cannot claim prejudice from a remedy that it might have faced in any event. Moreover, the reason for recasting the remedy is a reorganization implemented by the General Partner and its affiliates. Although the General Partner admittedly will be worse off than if the Merger enabled the General Partner to extract $171 million in breach of the LP Agreement and then escape any contractual consequence, a comparison to the General Partner's hoped-for result (and concomitant windfall) does not establish prejudice. From a different standpoint, the General Partner is better off, because it need only pay 58.6% of the Liability Award rather than 100%.

## A.     First Order Analysis: Derivative Or Direct

The General Partner frames its motion to dismiss as turning on whether the claim that gave rise to the Liability Award was derivative or direct. According to the General Partner, those are the only categories of investor claims that Delaware law recognizes and a claim must be one or the other. Moreover, according to the General Partner, the Delaware Supreme Court established the exclusive test for determining whether a claim is derivative or direct in *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004). In that decision, the Delaware Supreme Court stated:

> We set forth in this Opinion the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct. That issue must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the suing stockholders, individually)?

*Id.* at 1033.

In my view, the General Partner errs by treating *Tooley* as if its holding required all claims, whether sounding in tort, contract, or a statutory cause of action, to be brought derivatively whenever an entity in which the plaintiff is an investor can be said to have suffered harm such that some component of the plaintiff's loss could be framed as having been suffered indirectly. To my mind, that position overstates *Tooley*'s reach. *See NAF Hldgs., LLC v. Li Fung (Trading) Ltd.*, 118 A.3d 175, 176 (Del. 2015). Instead, *Tooley* and its progeny "deal with the distinct question of when a cause of action for breach of fiduciary duty or to enforce rights belonging to the corporation itself must be asserted derivatively." *Id.* The *Tooley* decision did not obviate the need to address an "important initial question": "[D]oes the plaintiff seek to bring a claim belonging to her personally or one belonging to the corporation itself?" *Id.* at 180.

As the General Partner interprets *Tooley*, Delaware law recognizes only two types of claims that investors can bring: direct claims and derivative claims. Accepting this dichotomous outlook for purposes of analysis, Brinckerhoff's claim for breach of the LP Agreement is properly categorized as direct. Brinckerhoff sued to enforce a contract to which he and the other limited partners were parties. They had standing to enforce that claim individually and directly. Their claim therefore survived the Merger, and it now can be remedied by awarding the unaffiliated limited partners at the time of the Merger their *pro rata* share of the Liability Award.

1.      **Direct Claims**

24

Direct claims are one category of claims that investors in Delaware entities bring. The General Partner's binary view of the world accommodates the existence of this category.

Direct claims encompass causes of action that belong to a plaintiff and which the plaintiff can assert in its own name. The direct claims governed by Delaware law that equity investors most commonly advance rely on particular rights that a holder of an equity security can exercise by virtue of being the owner of that security. For stockholders in a corporation, direct claims include the causes of action conferred on stockholders by specific statutory provisions of the DGCL.[11] Direct claims also include causes of action to enforce contract rights that stockholders possess under the corporation's certificate of incorporation and bylaws.[12] Stockholders similarly can sue

---

[11] *See, e.g.*, 8 *Del. C.* § 205 (right to bring action to validate a defective corporate act); *id.* § 231(c) (right to bring action challenging ballot, proxies, or votes); *id.* § 262(a) (right to bring appraisal proceeding).

[12] *See Tooley*, 845 A.2d at 1037-39; *Ruffalo v. Transtech Serv. P'rs Inc.*, 2010 WL 3307487, at *9 (Del. Ch. Aug. 23, 2010); *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *7, *13-14 (Del. Ch. May 5, 2010); *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003) (TABLE); *Rich Realty, Inc. v. Potter Anderson & Corroon LLP*, 2011 WL 743400, at *4 (Del. Super. Feb. 21, 2011); *see also Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *7 (Del. Ch. Jan. 18, 1996) (Allen, C.) (observing that if a lawsuit "seeks a remedy to compensate for the invasion of a property right of a stockholder," then the claim is direct and "the recovery will be for the stockholder"); Garrard Glenn, *The Stockholder's Suit—Corporate and Individual Grievances*, 33 Yale L.J. 580, 592 (1924) (explaining that a suit to enforce the constitutive corporate agreements is an individual, not a derivative, claim). As *Tooley* specifically held, stockholders suffer direct injury and may sue individually for breach of their contractual rights, even when all stockholders

25

directly to enforce contractual constraints on a board's authority under the charter, bylaws, and provisions of the DGCL.[13] The availability of a direct cause of action in these situations comports with Delaware's longstanding recognition that the DGCL, the certification of incorporation, and the bylaws together constitute a multi-party contract among the directors, officers, and stockholders of the corporation.[14] As parties to the contract, stockholders can enforce it.[15]

A limited partner in a Delaware limited partnership possesses analogous rights. The universe of direct claims starts with the causes of action granted to limited partners

---

had the same right and suffered the same injury. *Tooley*, 845 A.2d at 1039. *See generally Allen v. El Paso Pipeline GP Co., L.L.C.*, 90 A.3d 1097, 1105-09 (Del. Ch. 2014).

[13] *See Grimes v. Donald*, 673 A.2d 1207, 1213 n.15 (Del. 1996); *Shaev v. Adkerson*, 2015 WL 5882942, at *3 (Del. Ch. Oct. 5, 2015); *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *5 (Del. Ch. Aug. 16, 2010).

[14] *E.g.*, 8 *Del. C.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation."); *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 940 (Del. Ch. 2013) (Strine, C.) ("[O]ur Supreme Court has long noted that bylaws, together with the certificate of incorporation and the broader DGCL, form part of a flexible contract between corporations and stockholders."); *accord Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010) ("Corporate charters and bylaws are contracts among a corporation's shareholders . . . ."); *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) ("[A] corporate charter is both a contract between the State and the corporation, and the corporation and its shareholders.").

[15] *See Grimes*, 673 A.2d at 1212; *Grayson*, 2010 WL 3221951, at *6; *see also Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 660 (Del. Ch. 1988) (Allen, C.) (noting that the scope of a restriction on a fiduciary's authority is "not . . . a question that a court may leave to the [fiduciary] finally to decide so long as he does so honestly and competently; that is, it may not be left to the [fiduciary's] business judgment").

26

by specific statutory provisions of the LP Act.[16] It also includes causes of action to enforce the contract rights that the limited partners possess under the partnership's certificate of limited partnership and its partnership agreement.[17] A limited partner's ability to sue in contract is arguably more compelling than a stockholder's because "[i]t is the policy of [the LP Act] to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements." 6 *Del. C.* § 17-1101(c); *accord Elf Atochem N. Am. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999) ("The policy of freedom of contract underlies . . . the LP Act."). Allowing parties to the limited partnership agreement to enforce the agreement as a contract is consistent with public policy.

In addition to claims to enforce rights under the operative statutes and the constitutive documents of an entity, investors may possess other direct claims that belong to them personally. "Quintessential examples of personal claims would include a contract claim for breach of an agreement to purchase or sell shares or a tort claim for fraud in connection with the purchase or sale of shares." *In re Activision Blizzard, Inc. S'holder*

---

[16] *See, e.g.*, 6 *Del. C.* § 17-110(a) (right to bring action to determine the validity of any admission, election, appointment or removal or other withdrawal of a general partner of a limited partnership, and the right of any person to become or continue to be a general partner); *id.* § 17-205(b) (right to bring action to compel execution of partnership agreement or amendment); *id.* § 17-207 (right to recover damages from general partner for false statement in certificate contemplated by LP Act).

[17] *See Allen*, 90 A.3d at 1109; *Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d 370, 383 (Del. Ch. 2010); *Anglo Am. Sec. Fund LP v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 151, 154 (Del. Ch. 2003); *In re Cencom Cable Income P'rs, L.P.*, 2000 WL 130629, at *6 (Del. Ch. Jan. 27, 2000).

*Litig.*, --- A.3d ---, 2015 WL 2438067, at *25 (Del. Ch. May 20, 2015). The Delaware

Supreme Court recently considered another example of this type of direct claim. *See NAF*

*Hldgs., LLC v. Li Fung (Trading) Ltd.*, 118 A.3d 175, 176 (Del. 2015). There, a parent

corporation agreed to buy a company called Hampshire Group, Limited ("Hampshire"),

using two acquisition subsidiaries as the purchasing vehicles. The parent corporation was

not a party to the acquisition agreement. As part of the transaction, however, the parent

corporation entered into a commercial contract with Li & Fung (Trading) Limited ("Li &

Fung") to have Li & Fung act as a sourcing agent for Hampshire after the acquisition. Li

& Fung subsequently repudiated its contract with NAF and refused to serve as the

acquired company's sourcing agent, forcing the acquisition subsidiaries and Hampshire

to terminate the transaction agreement. The parent corporation sued Li & Fung for breach

of their commercial agreement, alleging that it suffered damages of $30 million when Li

& Fung repudiated the contract. Relying on *Tooley*, Li & Fung argued that the acquisition

subsidiaries, not the parent, suffered the harm, and that the parent only suffered loss

derivatively as the owner of the subsidiaries. Li & Fung contended that the parent could

not sue directly on its contact rights.

The United States Court of Appeals for the Second Circuit asked the Delaware

Supreme Court whether Li & Fung's argument was correct. The Delaware Supreme

Court said no:

> The case law under [*Tooley*] and its progeny deal with the distinct question
> of when a cause of action for breach of fiduciary duty or to enforce rights
> belonging to the corporation itself must be asserted derivatively. That body
> of law has no bearing on whether a party with its own rights as a signatory
> to a commercial contract may sue directly to enforce those rights.

*Id.* The Delaware Supreme Court recognized that the injury suffered by the parent corporation might well be co-extensive with the injury suffered by the subsidiaries. Li & Fung observed that the subsidiaries had settled their claims, and the Delaware Supreme Court recognized that such a fact could conceivably affect the damages analysis. But it did not affect whether the parent had standing to sue. For that purpose, "a more important initial question has to be answered: does the plaintiff seek to bring a claim belonging to her personally or one belonging to the corporation itself?" *Id.* at 180. Where the parent corporation possessed its own contractual cause of action, the parent could sue directly to enforce it.[18]

## 2.      Derivative Claims

Derivative claims are another category of claims that investors in Delaware entities bring. This is the other category of claims that the General Partner recognizes.

For a Delaware limited partnership, the LP Act codifies the concept of a derivative action:

> A limited partner or an assignee of a partnership interest may bring an action in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

---

[18] *Id.* It bears emphasizing that *NAF Holdings* involved a separate commercial agreement between the parent and Li & Fung. The nature of the cause of action was thus one step removed from a cause of action under a constitutive entity agreement, such as a certificate of incorporation or limited partnership agreement. The additional degree of separation makes the contract right easier to identify, but the underlying rationale applies equally to a right that an investor possesses under a constitutive entity agreement.

6 *Del. C.* § 17-1001. The limited partner's derivative action is a statutory descendant of the corporate derivative action. "Devised as a suit in equity, the purpose of the derivative action was . . . to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)). The claims that nineteenth century jurists confronted when originally recognizing the concept of the derivative action typically involved allegations of mismanagement or the misappropriation of funds from the corporate treasury.[19] Courts of equity responded by analogizing the role of a director to that of a trustee, "thus bringing the dispute within the ambit of existing and unquestioned doctrine, . . . provid[ing] a ready-made set of substantive rules to govern the directors and at the same time satisfy[ing] the requirement of a ground for equitable jurisdiction."[20] The stockholders were the beneficiaries of the quasi-trustees' duties and occupied a role analogous to the

---

[19] *See* Bert S. Prunty, Jr., *The Shareholders' Derivative Suit: Notes On Its Derivation*, 32 N.Y.U. L. Rev. 980, 982-83, 986-89 (1957) (tracing history of derivative actions and their initial focus on recovering funds misappropriated by management); *see also* Donna I. Dennis, *Contrivance and Collusion: The Corporate Origins of Shareholder Derivative Litigation in the United States*, 67 Rutgers U. L. Rev. 1479, 1481-85 (2015) (describing origins of derivative suit).

[20] Prunty, *supra*, at 986; *see Maldonado v. Flynn*, 413 A.2d 1251, 1261 (Del. Ch. 1980) (explaining that the "initial purpose" of the derivative action "was to provide the stockholder a right to call to account his directors for their management of the corporation, analogous to the right of a trust beneficiary to call his trustee to account for the management of the trust corpus"), *rev'd on other grounds sub nom. Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981).

*cestui que trust.*

Notably, under this theoretical paradigm, the stockholders' ability to sue did not depend on or run through the corporation. "Originally, in the United States the shareholder's suit, although on behalf of his corporation, was not based on a strict concept of the corporate entity."[21] The nineteenth century courts regarded the corporation as a necessary party, but the "[r]easons for the requirement, if given at all, were advanced with less certainty." Prunty, *supra*, at 988. The opinions were grounded in analogies to trust law and treated the stockholders as beneficiaries who could bring their fiduciaries to account without the need for a separate, entity-based cause of action. *Id.* at 989. The corporation's role was pragmatic, "that of a passive recipient of the proceeds as the most logical and convenient mode of aggregate recovery." *Id.* Consequently, "[f]or a time [the cause of action] bore none of the accoutrements of a thing secondary or derivative; it belonged to the shareholders and to them alone, although they could exercise it collectively through the corporation or individually through the representative suit." *Id.* at 994. "The plaintiff brought the action as representative of all the shareholders, except any that might be defendants, even though the recovery inured to the corporation." Grenier, *supra*, at 165-66.

---

[21] Edward J. Grenier, Jr., *Prorata Recovery By Shareholders on Corporate Causes of Action As A Means Of Achieving Corporate Justice*, 19 Wash. & Lee L. Rev. 165, 165 (1962); *accord* Prunty, *supra*, at 989.

The centrality of the corporation's role emerged from a different source—"from attempts, eventually successful, to extend the shareholders' right beyond the management group" to encompass corporate rights of action "against extracorporate defendants." Prunty, *supra*, at 994.

> For this purpose, trust law was inadequate in its then state of development. To span the difficulty, the derivative concept was forged through the union of the concepts of corporate entity and breach of trust. Both were necessary. Without the breach of trust the shareholder had no litigable complaint against the administration of affairs by his appointed representatives. Without the corporate entity the shareholder could invoke no trust doctrine recognizing a right of substitution in the enforcement of aggregate legal rights.

*Id.* The concept of the derivative action as two actions in one bridged the gap by permitting the stockholder to sue the corporation's managers for failing to pursue a claim against a third party belonging to the corporation. Grenier, *supra*, at 166; *accord* Prunty, *supra*, at 990-92.

Courts naturally looked with disfavor on efforts by stockholders to usurp the managers' authority to decide whether to bring a claim against third parties, and they relied on the corporation's ownership of the claim to limit the stockholder's ability to sue. The seminal decision was *Forbes v. Whitlock*, 3 Edw. Ch. 446 (N.Y. Ch. 1841). There, a third party defendant sold property to a corporation in return for stock. The plaintiffs sued in their capacity as stockholders, seeking to set aside the contract on grounds of fraud and to recover damages for its breach.

> [T]he court viewed the situation as one in which all rights vested in the corporation to which the covenants ran. . . . Only the rights of the corporate personality were at stake and those must be asserted in the corporate name. . . . Thus, to avoid what was vaguely referred to as "endless difficulty and

> embarrassment," the corporate entity concept was employed to defeat a shareholders' action. But plaintiffs also sought to hold defendant for misconduct in the office of treasurer to which he succeeded as a result of his sale of property for corporate stock. To this extent the bill presented managerial abuse, but the court applied its conceptualism to this part of the case as well.

Prunty, *supra*, at 990. Subsequent New York decisions built on *Forbes* to develop the idea that when a stockholder plaintiff sues, he sues in a derivative capacity and asserts a corporate cause of action. *See id.* at 991. The necessary role that the entity played in a suit against third parties came full circle and fed back into the concept of how a stockholder sued the internal corporate managers.

During the nineteenth century, derivative actions proliferated, not because of stockholders pursuing internal claims against corporate management, but because corporate management encouraged supportive stockholders to assert claims against third parties on the corporation's behalf. *See* Dennis, *supra*, at 1486-1517. Through a stockholder derivative action, corporate management could "achieve ends which were felt to be beyond their reach in normal corporate litigation." Prunty, *supra*, at 994. One end was access to the federal courts,[22] but that end was an instrumental one in service of a

---

[22] *See* 7 Charles Alan Wright et al., *Federal Practice and Procedure* § 1830 (3d ed. 2007) (explaining that "it was not uncommon for a corporation that had a direct claim against a party who was a cocitizen of the state of its incorporation to seek to have the claim litigated in a federal court as a derivative suit brought by a nominal shareholder-plaintiff who was chosen because the shareholder's citizenship was different from that of the corporation and its officers, as well as that of the prospective defendant" and noting that "[i]f an accommodating stockholder could not be found, one could be created by transferring stock to an individual whose citizenship enabled that person to bring the suit"

greater purpose. The real goal was to obtain a favorable forum to challenge the constitutionality of taxes and other forms of regulation. Dennis, *supra*, at 1511. Stockholder derivative litigation had a remarkably successful run, generating a series of landmark decisions involving constitutional challenges to regulatory statutes. *See id.* at 1511-13. Corporations only stopped using the derivative suit instrumentally after (i) the "switch in time that saved nine" produced a new reticence among the federal judiciary towards invalidating economic regulation on constitutional grounds and (ii) expansions in federal standing doctrine facilitated corporate access to the federal courts directly. *See id.* at 1517-18.

Because of the frequency and prominence of management-facilitated suits in which the corporation played a necessary role, the concept of a derivative action as two suits in one was firmly fixed by the early twentieth century. Chancellor Josiah O. Wolcott, one of Delaware's greatest jurists, wrote in 1932 that

> [t]he complainants' case, being asserted by them in their derivative right as stockholders, has a double aspect. Its nature is dual. It asserts as the principal cause of action a claim belonging to the corporation to have an accounting from the defendants and a decree against them for payment to the corporation of the sum found due on such accounting. In this aspect, the cause of action is the corporation's. It does not belong to the complainants. Inasmuch however as the corporation will not sue because of the domination over it by the alleged wrongdoers who are its directors, the complainants as stockholders have a right in equity to compel the assertion of the corporation's rights to redress. This is their individual right. A bill filed by stockholders in their derivative right therefore has two phases—one

---

(citing *Hawes v. City of Oakland*, 104 U.S. 450, 452-53 (1881))); Dennis, *supra*, at 1486-1511 (same).

is the equivalent of a suit to compel the corporation to sue, and the other is the suit by the corporation, asserted by the stockholders in its behalf, against those liable to it. The former belongs to the complaining stockholders; the latter to the corporation.[23]

In *Aronson v. Lewis*, the Delaware Supreme Court embraced the two-suits-in-one concept: "The nature of the [derivative] action is two-fold. First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it."[24] Later Delaware Supreme Court decisions have reaffirmed the two-fold nature of the derivative

---

[23] *Cantor v. Sachs*, 162 A. 73, 76 (Del. Ch. 1932) (citations omitted); *accord Harff v. Kerkorian*, 324 A.2d 215, 218 (Del. Ch. 1974), *aff'd in part, rev'd in part on other grounds*, 347 A.2d 133 (Del. 1975).

[24] 473 A.2d 805, 811 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *See id.* at 253 n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72-73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624-25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm*, 746 A.2d at 254. The seven partially overruled precedents otherwise remain good law. In this decision, I do not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, I have chosen to omit the cumbersome subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Delaware derivative action canon.

suit.[25] The corporation's role in a derivative suit against management, originally a secondary feature with a utilitarian purpose, has become conceptually central.

Today, claims against internal managers and claims against external third parties are treated as equivalent for purposes of doctrinal analysis. "'Any claim belonging to the corporation may, in appropriate circumstances, be asserted in a derivative action,' including claims that do—and claims that do not—involve corporate mismanagement or breach of fiduciary duty."[26] While it is usually easy to identify the derivative nature of a

---

[25] *See Schoon v. Smith*, 953 A.2d 196, 201-02 (Del. 2008) (tracing history of derivative action and explaining its dual nature); *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990) (quoting *Aronson* for the "two-fold" nature of the derivative action); *Sternberg v. O'Neil*, 550 A.2d 1105, 1124 n.41 (Del. 1988) ("The normal derivative suit was 'two suits in one: (1) The plaintiff brought a suit in equity against the corporation seeking an order against it; (2) to bring a suit for damages or other legal injury for damages or other relief against some third person who had caused legal injury to the corporation.'" (quoting Robert C. Clark, *Corporate Law* § 15.1, at 639-40 (1986))); *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988) (quoting *Aronson* in describing the "two-fold" nature of the derivative action); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 784 (Del. 1981) (citing "the 'two phases' of a derivative suit, the stockholder's suit to compel the corporation to sue and the corporation's suit").

[26] 3 Stephen A. Radin, *The Business Judgment Rule* 3612 (6th ed. 2009) (quoting *Midland Food Servs., LLC v. Castle Hill Hldgs. V, LLC*, 792 A.2d 920, 931 (Del. Ch. 1999) (Strine, V.C.)); *see also Ross v. Bernhard*, 396 U.S. 531, 542-43 (1970) (holding right to jury trial existed for breach of contract claim asserted by stockholder derivatively because "[t]he corporation, had it sued on its own behalf, would have been entitled to a jury's determination"); *First Hartford Corp. Pension Plan & Tr. v. United States*, 194 F.3d 1279, 1293 (Fed. Cir. 1999) (permitting "contract actions brought derivatively by shareholders on behalf of the contracting corporation"); *Slattery v. United States*, 35 Fed. Cl. 180, 183 (1996) (same); *Suess v. United States*, 33 Fed. Cl. 89, 93 (1995) (denying motion to dismiss a derivative claim for breach of contract against the United States); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 13.10, at 13-24 (3d ed. Supp. 2014) (explaining that a

claim that an investor seeks to bring on the entity's behalf against a third party, it is much

harder to determine whether a claim that an investor seeks to bring against internal

managers is derivative or direct.[27] This is because the nature of the fiduciary claim has

---

derivative action can be used to bring any corporate right that the corporation "has refused for one reason or another to assert").

[27] *See, e.g.*, *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004) ("Determining whether an action is derivative or direct is sometimes difficult. . . ."); *Grimes v. Donald*, 673 A.2d 1207, 1213 (Del. 1996) ("Although the tests have been articulated many times, it is often difficult to distinguish between a derivative and an individual action." (internal quotation marks omitted)); *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 351-52 (Del. 1988) ("[T]he line of distinction between derivative suits and those brought for the enforcement of personal rights asserted on behalf of a class of stockholders is often a narrow one." (internal quotation marks omitted)); *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *15 (Del. Ch. July 24, 2014) (describing the process of determining whether a challenge to an anti-takeover device is derivative or direct as "a less-than-precise exercise"); *Kelly v. Blum*, 2010 WL 629850, at *9 (Del. Ch. Feb. 24, 2010) ("The distinction between the rights of an LLC and the individual rights of its members if often quite narrow."); *Agostino v. Hicks*, 845 A.2d 1110, 1117 (Del. Ch. 2004) ("The distinction between direct and derivative claims is frustratingly difficult to describe with precision."); *Anglo Am. Sec. Fund LP v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 149-50 (Del. Ch. 2003) (describing the determination of whether a claim is director or derivative as "a rather nuanced test"); *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 755133, at *4 (Del. Ch. June 26, 2001) ("The line that separates an individual action from a derivative action is sometimes difficult to discern."); *Behrens v. Aerial Commc'ns Inc.*, 2001 WL 599870, at *3 (Del. Ch. May 18, 2001) ("The distinction between a direct and a derivative claim . . . sometimes is difficult to apply in specific circumstances . . . ."), *overruled on other grounds, Gentile v. Rossette*, 906 A.2d 91 (Del. 2006); *In re Triarc Cos., Inc.*, 791 A.2d 872, 878 (Del. Ch. 2001) ("The distinction between claims belonging to the corporation and those that can be prosecuted directly by stockholders individually is often 'a narrow one.'"); *In re Cencom Cable Income P'rs*, 2000 WL 130629, at *3 (Del. Ch. Jan. 27, 2000) ("Determining whether a claim is derivative or direct requires application of a rather subtle test."); *Turner v. Bernstein*, 1999 WL 66532, at *10 (Del. Ch. Feb. 9, 1999) (Strine, V.C.) ("[A] thin grey line often marks the difference between derivative and individual claims that arise in the merger context.").

not changed since the early nineteenth century. It continues to derive from the trust law principles applied by the nineteenth century jurists and therefore, from the standpoint of legal theory, does not require the presence of the corporate intermediary. The corporation plays an instrumental and practical role.

From the standpoint of legal realism, the act of characterizing a claim against entity managers as derivative owes more to substantive policy goals than to fine metaphysical distinctions. Classifying a claim as derivative furthers at least two major policies: "First, it ensures that injury to a whole association [of investors] is adjudicated on behalf of that whole and not just for the benefit of the individuals who have undertaken to pursue the claims." *Cencom*, 2000 WL 130629, at *4. This policy rests on the same pragmatic considerations that drove nineteenth century courts to bring the corporation into the lawsuit, even though the corporation's presence was not theoretically necessary given the analogy to trust law.

As Chief Justice Strine observed while serving on this court, derivative claims against entity managers "should be seen for what they are, a form of class action." *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 940 (Del. Ch. 2008) (Strine, V.C.). That does not mean, however, that it is optimal to prosecute them as class actions. "Where the remedy in a shareholder action will necessarily affect all shareholders . . . not only is such a case permissible as a class action (Rule 23(b)(1)) but, speaking prudentially, protection of all interests requires that it be litigated once, for all (Rule 23.1). A derivative characterization accomplishes that result." *Wells Fargo & Co. v. First Interstate Bancorp*, 1996 WL 32169, at *7 (Del. Ch. Jan. 18, 1996) (Allen, C.).

Particularly in a publicly traded entity, the derivative suit "has efficiency advantages over a class action. . . . For example, class actions can readily cause an enormous amount of the legal system's resources to be devoted to the task of class definition and certification, the giving of notices, and the processing and administration of individual claims. The derivative suit elegantly sidesteps these problems." Robert C. Clark, *Corporation Law* § 8.5, at 289 (1986).

There is also a second and perhaps more important policy served by a derivative characterization: protecting the entity and all of its investors against excessive litigation. A derivative characterization achieves this goal by triggering the substantive requirements of demand doctrine and the heightened pleading requirements of Rule 23.1. Together, the requirements serve a gatekeeping function by screening out weak claims.[28] The net effect is to reduce the overall volume of litigation, constrain the extent of interference with managerial decision-making, and limit the resource-drain that excessive litigation would impose.[29] By enforcing the demand doctrine through the heightened pleading requirements of Rule 23.1, a derivative characterization "guarantee[s] that the statutory power of directors to manage the legal affairs of the company [is] not

---

[28] *See Aronson*, 473 A.2d at 812; *Agostino*, 945 A.2d at 1116-17; *Seaford Funding L.P. v. M&M Assocs. II, L.P.*, 672 A.2d 66, 71 (Del. Ch. 1995).

[29] *See Kaplan*, 540 A.2d at 730 (noting the potential for conflict between directors' power to manage the corporation and the ability of stockholders to bring a derivative action); *accord Levine v. Smith*, 591 A.2d 194, 200 (Del. 1991).

disregarded except when necessary to serve the policy purpose justifying the recognition

of the derivative suit in the first instance."[30]

### 3. Evaluating The Claim That Resulted In The Liability Award

---

[30] *Cochran v. Stifel Fin. Corp.*, 2000 WL 286722, at *10 n.41 (Del. Ch. Mar. 8, 2000) (Strine, V.C.), *rev'd in part on other grounds*, 809 A.2d 555 (Del. 2002). The same principles can be seen at work in the law's recognition of the power of an independent committee of directors to assume control of a derivative claim that has passed the demand phase so as to ensure that the resolution of the claim serves the best interests of the corporation. *See Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981).

A third policy goal is sometimes cited, namely the notion of promoting intra-corporate dispute resolution by requiring stockholders to first make a demand on the board. *See, e.g., Agostino*, 845 A.2d at 1116; *Seaford Funding*, 672 A.2d at 71. If Delaware embraced a universal demand rule that did not penalize a plaintiff for making a demand, then the rationale of promoting an internal dispute mechanism would make sense. *See, e.g., Grimes*, 673 A.2d at 1218 n.21 (noting alternative of the universal demand rule). Under Delaware law, however, a plaintiff that makes demand waives the argument that demand was futile and concedes that the board is disinterested and independent for purposes of considering the demand, thereby causing the business judgment rule to govern the question of demand refusal. *Spiegel v. Buntrock*, 571 A.2d 767, 774 (Del. 1990). Because of the difficulties inherent in overcoming the business judgment rule for purposes of establishing demand refusal, a stockholder that believes it has a chance at pleading demand futility will not make a demand. In practice, therefore, Delaware law dissuades stockholders from making demands and does not promote internal dispute resolution. That approach, however, is not irrational. To the contrary, in my view, it is likely more efficient for corporations and their investors than promoting demand. That is because when a board receives a demand, it cannot stand neutral. *Kaplan*, 540 A.2d at 727. The board must conduct an investigation, which can be costly and disruptive, and determine what action to take. Any stockholder with one or more shares can force a corporation to incur that expense simply by firing off a letter. Anecdotal experience has taught me that it is usually less disruptive, cheaper, and therefore preferable from the corporation's standpoint to litigate demand futility based on the allegations of a complaint, rather than spend hundreds of thousands of dollars to investigate a demand. Channeling stockholders away from demand therefore makes sense, but it causes me to doubt that Delaware law can fairly be described as seeking to encourage demand and promote internal dispute resolution.

The claim that resulted in the Liability Award was a claim for breach of the LP Agreement. If forced under the General Partner's framework to choose between an exclusively direct characterization and an exclusively derivative characterization, then I believe it is a direct claim for breach of contract.

"Limited partnership agreements are a type of contract." *Norton v. K-Sea Transp. P'rs L.P.,* 67 A.3d 354, 360 (Del. 2013). By statute, both the partners and the limited partnership are parties to and bound by the limited partnership agreement, regardless of whether or not they sign it:

> A partner of a limited partnership . . . is bound by the partnership agreement whether or not the partner . . . executes the partnership agreement. A limited partnership is not required to execute its partnership agreement. A limited partnership is bound by its partnership whether or not the limited partnership executes the partnership agreement.

6 *Del. C.* § 17-101(12). Just as stockholders can sue directly to enforce contractual constraints on a board's authority under the charter, bylaws, and provisions of the DGCL, limited partners can sue directly to enforce contractual constraints in the limited partnership agreement.[31]

As noted, recognizing the right of limited partners to sue to directly under the limited partnership agreement is particularly compelling because the public policy underlying the LP Act is "to give maximum effect to the principle of freedom of contract

---

[31] *See Allen v. El Paso Pipeline GP Co., L.L.C.*, 90 A.3d 1097, 1109 (Del. Ch. 2014); *Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d 370, 383 (Del. Ch. 2010); *Anglo Am. Sec. Fund LP v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 151, 154 (Del. Ch. 2003); *Cencom*, 2000 WL 130629, at *6.

and to the enforceability of partnership agreements." 6 *Del. C.* § 17-1101(c). The LP Act

authorizes drafters of a limited partnership agreement to eliminate all other sources of

duty and create a contractual entity:

> To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement, the partner's or other person's duties may be expended or restricted or eliminated by provisions in the partnership agreement; provided that the partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing.

*Id.* § 17-1101(d).

The LP Agreement took full advantage of this authority. *See* LPA § 7.9(e). In

place of common law duties, the LP Agreement substituted contractual commitments.

One of those commitments was the Conflict-of-Interest Provision. That section provided

that if the General Partner took action in its capacity as the General Partner, and if the

decision involved a conflict of interest for the General Partner, then the action would be

"permitted and deemed approved by all Partners" and "not constitute a breach" of the LP

Agreement or "any duty stated or implied by law or equity" as long as the General

Partner proceeded in one of four contractually specified ways. *Id.* § 7.9(a).

The Conflict-of-Interest Provision placed a contractual limit on the General

Partner's authority. Unless the General Partner followed one of the four contractually

permitted routes, the General Partner could not cause the Partnership to engage in a

conflict-of-interest transaction. The Post-Trial Opinion determined that the General

Partner breached that contractual requirement. Brinckerhoff and the other limited partners

had the right to seek to enforce the Conflict-of-Interest Provision and to obtain damages

if the provision was breached. Once again, a claim for breach of a constitutive entity agreement, like a certificate of incorporation or a limited partnership agreement, is a direct claim.

The General Partner responds to this analysis by rejecting the role of the Conflict-of-Interest Provision and arguing that any claim that rests on an overpayment by an entity is inherently derivative, regardless of whether the overpayment violated a specific contractual provision. *See* Dkt. 229 at 14-17. Not so. A claim for breach of a specific contractual provision is a claim for breach of contract.

An analogy to a different type of contract right may help illustrate the point. Assume that an investor in a corporation purchased a series of preferred stock, and that a right in the certificate of designations for the preferred stock states that the corporation shall not make any expenditure in excess of $1 million without the affirmative vote of a majority of the outstanding shares of that series of preferred stock (the "Blocking Right"). Further assume that the corporation paid $2 million to purchase assets from a third party that the investor believed were only worth $1.5 million. If the investor challenged the asset purchase on the theory that the board of directors breached its fiduciary duties by paying too much, that challenge would be a derivative claim. But the Blocking Right changes matters. The Blocking Right says that without an affirmative vote from the investor's series of preferred stock, the corporation cannot engage in the transaction. The

Blocking Right gives the investor a claim for breach of contract that the investor can assert directly.[32]

The Conflict-of-Interest Provision operated like the Blocking Right, although its terms were more complex. The Blocking Right would bar the corporation from engaging in corporate expenditures above a particular dollar amount without the affirmative vote of that series of preferred stock. The Conflict-of-Interest Provision barred the General Partner from causing El Paso MLP to engage in any transaction that (i) involved a potential conflict of interest and (ii) failed to comply with one of the four contractual paths. If both conditions were met, then the General Partner could not proceed with the transaction, just as the corporation could not proceed with the corporate expenditure without violating the Blocking Right. The claim that the General Partner proceeded with the Fall Dropdown without complying with the Conflict-of-Interest Provision is thus a direct claim for breach of contract.

Anticipating this response, the General Partner next argues that the concept of Special Approval under the Conflict-of-Interest Provision inherently involves the members of the Committee exercising their judgment, and that traditionally Delaware courts have not regarded claims challenging the exercise of judgment as sounding in

---

[32] *See, e.g.*, *Matulich v. Aegis Commc'ns Gp., Inc.*, 942 A.2d 596, 602 (Del. 2008) (describing preferred shareholders' blocking right as contractual and explaining that "an exercise of that contractual right in a voting format is legally distinct from the statutory right to vote on the merger"); *OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 704 (Del. Ch. 2014) (explaining that preferred stock gave its holder "contractual blocking rights").

44

contract. *See* Dkt. 229 at 19-20. In this case, however, the contract right was framed in terms of the Committee's judgment. A contract provision can turn on a party's mental state. *See, e.g., Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 746-48 (Del. Ch. 2008) (interpreting merger agreement in which contractual limitation on liability did not apply to a "knowing and intentional breach"). Once the Committee's judgment reached the level of bad faith, the General Partner breached the Conflict-of-Interest Provision, giving rise to a direct claim.

Finally, the General Partner argues that in *Tooley*, the Delaware Supreme Court overturned the decades of case law that permitted stockholders to enforce DGCL, charter, and bylaw provisions directly. *See Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004). The *Tooley* decision accomplished this, says the General Partner, when it discarded the concept of special injury. That is not how I read *Tooley*.

Before *Tooley*, Delaware Supreme Court decisions had used the concept of special injury to determine when a plaintiff could sue directly. *See Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1079 (Del. 1986). A special injury was defined as a wrong "separate and distinct from that suffered by other shareholders . . . or a wrong involving a contractual right of a shareholder." *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del. Ch. 1985), *aff'd*, 500 A.2d 1346 (Del. 1985). If the plaintiffs had suffered special injury, then the plaintiffs could sue directly, even if the same wrong injured the corporation as well.

It is true that *Tooley* discarded the term "special injury," but *Tooley* did not overrule the results in the cases that used that term or alter the longstanding principle that a stockholder suffered injury when its contractual rights were breached. Instead, *Tooley*

45

rejected an argument that defendants regularly advanced in favor of characterizing such claims as derivative, namely that if all of the stockholders held the same right, and if all of the stockholders were injured equally, then the claim should be regarded as derivative. *Tooley* explained that this argument was incorrect and that claims of this type remain direct.

*Tooley* involved a third-party, two-step acquisition in which the target corporation consented to the acquirer postponing the closing of the first-step tender offer by twenty-two days. Stockholder plaintiffs sued, claiming that the stockholders of the target corporation had a contractual right to have the offer close on time. The plaintiffs claimed that if the offer had closed on time, then the stockholders would have gotten their money faster. As damages, the plaintiffs sought the time value of money that the stockholders lost from the delay.

The Court of Chancery dismissed the complaint, reasoning that the claims were derivative. The Court of Chancery held that there was no meaningful distinction between the contract rights of the tendering and non-tendering stockholders, such that they all held parallel contract rights. The decision then reasoned that "[b]ecause this delay affected all DLJ shareholders equally, plaintiffs' injury was not a special injury, and this action is, thus, a derivative action at most." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 2003 WL 203060, at *4 (Del. Ch. Jan. 21, 2003). In other words, the Court of Chancery accepted the argument that it was appropriate to treat a contractual claim as derivative if all of the stockholders held the same contractual right and all suffered the same injury to their parallel contractual rights.

46

The Delaware Supreme Court reversed. The high court conscientiously conceded that the concept of special injury had become "amorphous and confusing." *Tooley*, 845 A.2d at 1035. The Delaware Supreme Court traced much of the confusion to *Bokat v. Getty Oil Co.*, 262 A.2d 246 (Del. 1970), where it held that "[w]hen an injury to corporate stock falls equally upon all stockholders, then an individual stockholder may not recover for the injury to his stock alone, but must seek recovery derivatively in behalf of the corporation." *Id.* at 249. In *Tooley*, the Delaware Supreme Court described this statement as both "confusing and inaccurate." *Tooley*, 845 A.2d at 1037.

> It is confusing because it appears to have been intended to address the fact that an injury to the corporation tends to diminish each share of stock equally because corporate assets or their value are diminished. In that sense, the *indirect* injury to the stockholders arising out of the harm to the corporation comes about solely by virtue of their stockholdings. It does not arise out of any independent or direct harm to the stockholders, individually. *That concept is also inaccurate because a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim.*

*Id.* (second emphasis added). As demonstrated by this passage, the *Tooley* decision sought to clarify *Bokat* by distinguishing between (i) an injury that fell *indirectly* on all stockholders equally, which supported a derivative claim, and (ii) an injury that affected stockholders *directly*, even if all stockholders suffered the same injury, which gave rise to a direct claim.

Having revisited the concept of special injury, the Delaware Supreme Court surveyed the post-*Bokat* decisions that addressed the distinction between direct and derivative claims. Despite having rejected the concept of special injury, the Delaware

47

Supreme court re-affirmed its precedents as having reached correct results on the facts presented. *Id.* at 1039. Far from overruling those cases, as the General Partner claims, *Tooley* reinforced them by clarifying that stockholders continue to suffer direct injury and can sue individually when they invoke their statutory or contractual rights, even if all stockholders possessed the same rights and suffered parallel injuries.

The actual outcome in *Tooley* confirms this. The Delaware Supreme Court ruled that the stockholders' claim was not derivative, even though all of the stockholders had the same contractual right to a timely closing and the defendants' action affected all stockholders similarly. The Delaware Supreme Court reached this conclusion because the right that was implicated belonged to the stockholders. This holding confirmed the direct nature of a stockholder's cause of action for injury to its contractual rights as a stockholder, even when a plaintiff asserts the same contractual right in a representative capacity on behalf of all stockholders.

More recently, *NAF Holdings* re-affirmed this point by rejecting the contention that a parent corporation that owned 100% of the equity of its two subsidiaries had to sue derivatively through its subsidiaries because the parent was injured indirectly as a result of harm to those entities. *NAF Hldgs., LLC v. Li Fung (Trading) Ltd.*, 118 A.3d 175, 180 (Del. 2015). The defendant there argued that under *Tooley*, an investor always had to sue derivatively "whenever the corporation of which the plaintiff is a stockholder suffered the alleged harm," regardless of the nature of the investor's claim. *Id.* The Delaware Supreme Court agreed that if this proposition were true, then "NAF's suit for compensation for the diminution in value of its stock in the NAF Subsidiaries could not be brought as a direct

48

action." *Id.* But the Delaware Supreme Court disagreed with the premise, stressing that "a more important initial question has to be answered: does the plaintiff seek to bring a claim belonging to her personally or one belonging to the corporation itself?" *Id.* In *NAF Holdings*, the plaintiff sought to bring a breach of contract claim belonging to the parent corporation and so was not required to sue derivatively through its subsidiaries. Other post-*Tooley* cases likewise have recognized that stockholders suffer direct injury and may sue individually for breach of their contractual rights, even when all stockholders held the same right and suffered the same injury.[33]

In my view, the two-part test that the Delaware Supreme Court created in *Tooley* does not apply to contract rights. It deals with a different subject: "determining the line between direct actions for breach of fiduciary duty suits by stockholders and derivative actions for breach of fiduciary duty suits subject to demand excusal." *NAF Hldgs.*, 118 A.3d at 179. This case did not involve any claims for breach of fiduciary duty, the Post-Trial Opinion did not address breaches of fiduciary duty, and the Liability Award does not rest on a breach of fiduciary duty.

To obtain the Liability Award, Brinckerhoff proved that the General Partner had breached the LP Agreement, thereby violating the contract rights of the limited partners. If the claim that supported the Liability Award must be categorized either as exclusively

---

[33] *See, e.g.*, *Ruffalo v. Transtech Serv. P'rs Inc.*, 2010 WL 3307487, at *9 (Del. Ch. Aug. 23, 2010); *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *7, *13-14 (Del. Ch. May 5, 2010); *Rich Realty, Inc. v. Potter Anderson & Corroon LLP*, 2011 WL 743400, at *4 (Del. Super. Feb. 21, 2011).

direct or exclusively derivative, then Brinckerhoff's cause of action states a direct claim. The claim therefore survived the Merger and can be remedied by permitting the unaffiliated limited partners at the time of the Merger to recover their *pro rata* share of the Liability Award.

### 4. "Ye Olde Slippery Slope"[34]

The General Partner finally seeks to avoid the implications of the foregoing analysis by complaining that if Brinckerhoff's claim is contractual and direct, then all intra-entity limited partnership disputes will be direct claims. In other words, unless this case is dismissed and the Liability Award rendered a nullity, the concept of derivative actions no longer will have meaning for alternative entities. Not so.

This court's decisions in the limited partnership context have distinguished between suits for breach of the limited partnership agreement and suits challenging the discretion afforded to the general partner. *See Litman v. Prudential-Bache Props., Inc.*, 611 A.2d 12 (Del. Ch. 1992). In *Litman*, limited partners filed suit against the general partners after the limited partnership announced a reduction in its quarterly per-unit distributions. The court distinguished between (i) a claim that the general partner had breached a contractual provision governing distributions and (ii) a generic theory that the general partners had "inadequately investigat[ed] and monitor[ed] investments." *Id.* at 16. The complaint asserted only the latter, not the former, and therefore stated a derivative

---

[34] *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 818 (Del. Ch. 2007) (Strine, V.C.).

claim. Later, in *Cencom*, limited partners asserted the type of contractual claim contemplated by *Litman*, arguing that the general partner breached the limited partnership agreement by improperly terminating their priority distributions. *In re Cencom Cable Income P'rs*, 2000 WL 130629, at *3 (Del. Ch. Jan. 27, 2000). The court agreed that the limited partners had stated a direct claim for violation of their contractual right. This court reached the same conclusion in the *Anglo American* case. *See Anglo Am. Sec. Fund LP v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 151 (Del. Ch. 2003). The limited partners asserted that the general partner breached the terms of the limited partnership agreement when withdrawing funds from its capital account, and the court held that the breach of contract claim was direct. The court also held that the plaintiffs stated a direct claim when they asserted that the general partner failed to provide a contractually required year-end report.

The distinctions drawn in *Litman*, *Cencom*, and *Anglo American* continue to apply. The question is whether the limited partner has identified a specific provision of the partnership agreement that governed the conduct in question. Here, Brinckerhoff asserted and proved a specific violation of the Conflict-of-Interest Provision. Unlike in *Litman*, Brinckerhoff did not advance general allegations about poor or feckless decision-making. Brinckerhoff also did not argue "simply that the Partnership paid too much." *Allen v. El Paso Pipeline GP Co., L.L.C.*, 90 A.3d 1097, 1110 (Del. Ch. 2014). He proved that the General Partner fell short of the express contractual standard in the Conflict-of-Interest Provision that required a good faith determination by the Committee.

It is likely true that when parties have formed a contractual entity, more claims will be deemed direct, but that is a consequence of the choice that the sponsor of the entity made. Picking a form of entity

> involves several considerations. For example, choice of form and structure necessarily requires understanding the needs and nature of the business or activity being organized, the benefits and limitations of alternative legal forms or entities that are available . . . , the structures that can be used in implementing those forms or entities, and any other relevant matters that should be considered in organizing a . . . business. The ultimate choice of form and structure, however, results from a weighed analysis of available forms and internal structures as applied to the unique characteristics of a . . . particular deal or transaction.

Robert R. Keatinge & Ann E. Conaway, *Keatinge and Conaway on Choice of Business Entity: Selecting Form and Structure For a Closely Held Business* § 1:1 (2015). The choice of entity necessarily affects the nature and types of claims that investors in the entity can bring. Parties who choose an alternative entity—and particularly those who form a contractual entity—cannot expect the automatic trans-species application of corporate principles. *Cf. Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *19 (Del. Ch. Sept. 14, 2007) ("Because the conceptual underpinnings of the corporation law and Delaware's limited partnership law are different, courts should be wary of uncritically importing requirements from the DGCL into the limited partnership context.").

"[A]n alternative entity . . . is not the same thing as a corporation." *2009 Caiola Family Tr. v. PWA, LLC*, 2015 WL 6007596, at *1 (Del. Ch. Oct. 14, 2015). More to the point, a contractual alternative entity is not the same thing as a corporation. Creating such an entity has many advantages. In theory, obligations and rights can be defined more

explicitly and better addressed *ex ante*, rather than leaving issues for *ex post* judicial evaluation.[35] Although the contractual flexibility could be used to provide investors with greater protection, in practice the agreements establish litigation standards that are more defendant-friendly than traditional fiduciary duty standards.[36] As the sponsor of El Paso MLP, El Paso Parent followed that course, "borrow[ed] its basic framework from the common law, but replace[d] the common law rules with contractual standards more favorable to the General Partner." *Allen*, 90 A.3d at 1103.

An additional benefit from a contractual entity is the ability to limit the number of potential defendants who face litigation risk, as well as the scope of that risk. The parties to the contract only can sue other parties, and the nature of the available remedies shifts

---

[35] *See* Leo E. Strine, Jr. & J. Travis Laster, *The Siren Song of Unlimited Contractual Freedom, in* Research Handbook on Partnerships, LLCs and Alternative Forms of Business Organizations 11, 15-16 (Robert W. Hillman & Mark J. Loewenstein eds., 2014) ("Another argument often made in favor of alternative entity statutes is that they allow for the elimination of fiduciary duties and the establishment of a purely contractual relationship between entity managers and investors."); Rutheford B. Campbell, Jr., *Bumping Along the Bottom: Abandoned Principles and Failed Fiduciary Standards in Uniform Partnership and LLC Statutes*, 96 Ky. L.J. 163, 169 (2007) (describing the argument that permitting a fully contractual entity is "respectful of the autonomy of rational beings (broadly, a Kantian notion) and promotes the maximization of overall utility or happiness (a utilitarian goal)"); Reza Dibadj, *The Misguided Transformation of Loyalty Into Contract*, 41 Tulsa L. Rev., 451, 464 (2006) (describing the argument that permitting the existence of fully contractual entities is wealth-maximizing).

[36] *See* 6 *Del. C.* § 17–1101(d); Brent J. Horton, *The Going–Private Freeze–Out: A Unique Danger for Investors in Delaware Non–Corporate Business Associations*, 38 Del. J. Corp. L. 53 (2013); Mohsen Manesh, *Contractual Freedom Under Delaware Alternative Entity Law: Evidence from Publicly Traded LPs and LLCs*, 37 J. Corp. L. 555 (2012).

from the broader strains of equity to the narrower lineaments of contract law.[37] El Paso Parent and its affiliates benefitted from the limited number of possible defendants in this litigation, which enabled all of the defendants except the General Partner to prevail on their motion for summary judgment. *See In re El Paso Pipeline P'rs L.P. Deriv. Litig.*, 2014 WL 2641304 (Del. Ch. June 12, 2014) (ORDER). An alternative entity also has greater flexibility to provide indemnification and to adopt contractual restrictions on investor litigation.[38] The LP Agreement took advantage of this feature as well. *See* LPA § 7.7.

---

[37] *See Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 194 (Del. Ch. 2014) ("When parties establish a purely contractual relationship, they have chosen to limit themselves to pursuing contractual remedies against their contractual counterparties. Under those circumstances, a claim for aiding and abetting cannot be used to expand the possible range of defendants."); *Gerber v. EPE Hldgs., LLC*, 2013 WL 209658, at *11 (Del. Ch. Jan. 18, 2013) (holding that defendants could not aid and abet a breach of a limited partnership agreement where the agreement eliminated fiduciary duties); Daniel S. Kleinberger, *Two Decades of "Alternative Entities": From Tax Rationalization Through Alphabet Soup to Contract as Deity*, 14 Fordham J. Corp. & Fin. L. 445, 467-68 (2009) ("As for remedies, the difference between contract claims and breach of fiduciary duty claims is substantial.").

[38] *See* Samuel T. Hirzel & Dawn Kurtz Crompton, *Finding (and Funding) the Cost of Freedom: Indemnification and Advancement for Alternative Business Entities*, 15 Del. Rev. 83, 86-94 (2015) ("While the DGCL provides a default structure of indemnification and advancement for Delaware corporations, the LLC Act and the LLP Act simply permit the members or partners to provide for such rights contractually."). *Compare ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014) (permitting non-stock corporation to adopt fee-shifting bylaw) *with* 8 *Del. C.* § 102(f) ("The certificate of incorporation may not contain any provision that would impose liability on a stockholder for the attorneys' fees or expenses of the corporation or any other party in connection with an internal corporate claim, as defined in § 115 of this title.") *and id.* § 109(b) ("The bylaws may not contain any provision that would impose liability on a stockholder for the attorneys' fees or expenses of the corporation or any other party in connection with an

One consequence of a contractual entity is that the resulting rights are contractual. Consequently, parties to the contract can enforce them directly. Procedural hurdles to derivative actions, such as Rule 23.1 and the demand doctrine, do not apply to a contractual cause of action. Generally speaking, the test for distinguishing between direct and derivative claims in the limited partnership context is substantially the same as in the corporate context,[39] but the answers that test gives when applied to a contractual entity are different.[40]

In this case, when El Paso Parent created El Paso MLP, it formed a contractual entity. El Paso MLP and its affiliates gained many benefits from that choice. In this case, those contractual benefits enabled El Paso Parent and its affiliates to prevail at the motion to dismiss stage against certain claims regarding the Fall Dropdown and a related transaction. Similar contractual benefits enabled El Paso Parent and its affiliates (other than the General Partner) to prevail on the balance of Brinckerhoff's claims at the

internal corporate claim, as defined in § 115 of this title."). The LP Act does not contain provisions analogous to Sections 102(f) and 109(b).

[39] *See Brinckerhoff v. Enbridge Energy Co., Inc.*, 2011 WL 4599654, at *5-6 (Del. Ch. Sept. 30, 2011); *Anglo Am. Sec. Fund LP.*, 829 A.2d at 149-50; *Litman*, 611 A.2d at 15.

[40] *See Anglo Am.*, 829 A.2d at 151 (explaining that claims "which in a corporate context might be classified as derivative, *must* be brought as direct claims [in the limited partnership context] in order to enable the injured parties to recover while preventing a windfall to the individuals or entities whose interests were not injured"); *In re Cencom*, 2000 WL 130629, at *2 ("Mechanistically applying the corporate law rule surrounding derivative claims can sometimes defeat efficient resolution of claims in other contexts . . . .").

summary judgment stage. Having received the benefits of a contractual entity, the General Partner now wants to obtain dismissal of the remaining claim for breach of contract and the resulting Liability Award by invoking non-contractual doctrines.

"There is much democratic wisdom in the trite phrase 'you can't have your cake and eat it too.' That phrase applies here." *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 621 (Del. Ch. 1999) (Strine, V.C.). Having chosen the contractual path and enjoyed many of its benefits, the General Partner cannot now complain that the surviving claim for breach of the LP Agreement is a claim for breach of contract and therefore direct.

## B.    Second Order Analysis: Dual

As discussed in the preceding section, the General Partner construes Delaware law as recognizing only two types of claims that investors can bring: direct claims and derivative claims. In the preceding section, this decision assumed for purposes of analysis that the General Partner's bi-partite conceptualization accurately described Delaware law and concluded that Brinckerhoff's claim for breach of the LP Agreement was direct. In my view, however, the General Partner's assessment is overly narrow. In reality, Delaware law recognizes a third category—dual-natured claims—that have both direct and derivative characteristics.[41] Dual-natured claims exist because some injuries affect

---

[41] *See, e.g., Gatz v. Ponsoldt*, 925 A.2d 1265, 1268 (Del. 2007) ("[T]he claims before us are not exclusively derivative and could be brought directly."); *Gentile v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006) (describing scenario giving rise to dual-natured claims); *Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1079 (Del. 1986) (finding that

56

*both* the corporation *and* the stockholders and can be remedied *either* at the corporate *or* the stockholder level.[42] The Delaware Supreme Court has held that when this dual aspect is present, "[b]oth types of claims may be litigated." *Loral Space & Commc'ns Inc. v. Highland Crusader Offshore P'rs, L.P.*, 977 A.2d 867, 868 (Del. 2009).

To determine whether a claim has dual characteristics, Delaware decisions have used the *Tooley* test. The General Partner argues that under *Tooley*, only El Paso MLP, and not anyone else, suffered an injury from the Fall Dropdown. The General Partner

---

complaint pled "claims that support both individual and derivative causes of action"); *Dubroff v. Wren Hldgs., LLC (Dubroff I)*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009) ("*Gentile* and its progeny make clear that a shareholder's claim can be both derivative and direct."); *Thornton v. Bernard Techs., Inc.*, 2009 WL 426179, at *3 n.28 (Del. Ch. Feb. 20, 2009) ("It is possible for a claim to be both derivative and direct."). *See generally* Kurt M. Heyman & Patricia L. Enerio, *The Disappearing Distinction Between Derivative And Direct Claims*, 4 Del. L. Rev. 155, 169 n.53 (2001) ("Delaware courts also recognize that some claims . . . are *both* derivative and direct in nature, in which case they can be pursued in *either* fashion.").

[42] *See Grimes v. Donald*, 673 A.2d 1207, 1212 (Del. 1996) ("Courts have long recognized that the same set of facts can give rise both to a direct claim and a derivative claim."); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 655 (Del. Ch. 2013) (discussing a dual injury giving rise to direct and derivative claims); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 2011 WL 3371493, at *5 n.31 (Del. Ch. Aug. 5, 2011) ("Although the *Tooley* formulation provides a two-part analysis for determining whether an asserted claim is direct or derivative, there are some limited exceptions where the same facts may support both direct and derivative claims."); *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *9 n.68 (Del. Ch. Oct. 28, 2010) ("The same facts may support both direct and derivative claims."); *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1181 n.54 (Del. Ch. 2006) (acknowledging the "common sense principle" that the same set of facts can set forth both direct and derivative claims seeking different forms of relief); *Odyssey P'rs v. Fleming Co.*, 1998 WL 155543, at *3 (Del. Ch. Mar. 27, 1998) ("[I]n some circumstances, the same conduct (or aspects thereof) may give rise to both derivative and direct claims.").

then argues that the injury only could be remedied through an award of damages to El Paso MLP and not by any other means. I disagree on both points.

For purposes of this section's analysis of *Tooley*, this decision sets aside the contractual injury suffered by the limited partners. Taking the contractual injury into account makes the *Tooley* analysis relatively straightforward: the limited partners suffered a distinct injury in the form of the breach of their contract rights, and that injury can be remedied at the limited partner level. *See Allen*, 90 A.3d at 1109; *Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d 370, 383 (Del. Ch. 2010). In my view, however, even without considering the contractual angle, the Fall Dropdown inflicted injury on both El Paso MLP and the unaffiliated limited partners. The injury suffered by the unaffiliated limited partners is related to but distinguishable from the entity-level injury suffered by El Paso MLP. The remedy in this case could operate at the entity level, and as long as El Paso MLP remained a separate, independent entity, that approach made the most practical sense. But the injury also could be—and still can be—remedied at the limited partner level.

In my view, because the claim that gave rise to the Liability Award is a dual claim, Brinckerhoff can continue to litigate the direct aspects of that claim notwithstanding the Merger. This means that Brinckerhoff and the other limited partners can recover their *pro rata* share of the Liability Award.

### 1. The First Prong Of *Tooley*

Adapted to a limited partnership, *Tooley*'s first prong asks who suffered the alleged injury, the partnership or the limited partners individually? *See Tooley v.*

*Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). The *Tooley* decision framed the inquiry as if these options were exclusive alternatives (the partnership *or* the limited partners). *See id.* In this case, however, the answer is both: El Paso MLP *and* the limited partners each suffered injuries.

Setting aside the injury to the limited partners' contract rights, El Paso MLP and the limited partners each suffered injuries because of the nature of the transfer effected through the Fall Dropdown. That transaction did not only result in an overpayment from the Partnership to the General Partner; it also effectively reallocated value from the unaffiliated limited partners to the General Partner.[43]

The most obvious consequence of the Fall Dropdown was the infliction of harm on the Partnership. In this case, by causing El Paso MLP to overpay in the Fall Dropdown, the General Partner left the Partnership $171 million poorer. El Paso MLP would have suffered the same harm from any overpayment, including a wrongful transfer to a third party. Whenever money leaves an entity wrongfully, it impoverishes the entity and enriches the recipient. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 819 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006).

---

[43] Technically, the Fall Dropdown reallocated value to El Paso Parent. In the Fall Dropdown, El Paso Parent sold the member units in the LLCs to El Paso MLP, so although the General Partner was the party to the LP Agreement and liable for breach of contract, El Paso Parent received the benefit of the $171 million. El Paso Parent owned 100% of the General Partner. For simplicity, this decision refers to the benefit as running to the General Partner, even though technically it ran to the General Partner's affiliate.

An equally obvious consequence of the overpayment was that the harm inflicted on the Partnership injured all of the investors in the Partnership proportionately. The value of a Delaware entity inures ultimately to the owners of its equity in their capacity as residual claimants. When funds wrongfully leave a Delaware entity, the investors suffer harm indirectly in proportion to their ownership interests.[44] For purposes of the Fall Dropdown, at this level of analysis, the General Partner reduced the aggregate value of the equity investors' ownership interests by $171 million, divided proportionately across their ownership interests. Notably, this interpretation of the harm applies regardless of who receives the benefit of the wrongful transfer. As with the direct harm suffered by the entity, investors suffer indirectly regardless of the identity of the recipient, even if it is a third party.

In cases addressing the distinction between derivative and direct claims, this is often as far as the assessment of the injury goes. But a more realistic evaluation takes the additional step of recognizing that a wrongful third party transfer operates differently than a wrongful insider transfer. A wrongful third party transfer takes value out of the entity and away from the existing entity claimants. A wrongful insider transfer also takes value from the entity, but in doing so it reallocates value among the existing entity

---

[44] More accurately, investors suffer harm in order of their priority in the capital stack, and then proportionately within each level of priority based on the extent of their investment at that level of priority. The presence of creditors or other parties with superior claims to the value of a litigation asset is a consideration whenever a court evaluates the possibility of a *pro rata* remedy. *See infra* Part III.C.2.

claimants. All of the claimants suffer a proportionate loss according to the priority of their claims, but the insider receives an offsetting benefit that exceeds the insider's share of the loss. In reality, the insider isn't injured at all. The insider gains at the expense of the other investors. The net effect is to extract value from the unaffiliated investors for the benefit of the insider.

The Fall Dropdown illustrates this process. At the time of the transfer, the General Partner held a 2% general partner interest in the Partnership and, in that capacity, indirectly suffered 2% of the $171 million loss—a decline in value of approximately $3.42 million. The General Partner also held a 52% limited partner interest and, in that capacity, indirectly suffered 52% of the $171 million loss—a decline in value of approximately $88.92 million. The unaffiliated limited partners held the remaining 46% partnership interest and suffered the balance of the loss—a decline in value of approximately $78.66 million. Unlike the unaffiliated limited partners, however, the General Partner received a direct gain of $171 million, which more than overcame the General Partner's proportionate indirect loss. By extracting $171 million and suffering an indirect loss of $92.34 million ($3.42 million + $88.92 million), the General Partner came out ahead by $78.66 million.[45]

---

[45] The real-world benefit to the General Partner is actually somewhat greater. Because of the endowment effect, parties prefer actual ownership to indirect ownership. *See generally* Daniel Kahneman, Jack L. Knetsch & Richard H. Thaler, *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Persps. 193 (1991). Parties therefore value more highly the receipt of cash rather than a proportionate ownership interest in an entity that owns cash. A party like the General Partner would not

The limited partners, by contrast, did not receive an offsetting gain. They only suffered a loss. Moreover, their loss was the General Partner's gain ($78.66 million loss = $78.66 million net gain). Through the transfer, the General Partner extracted value from the unaffiliated limited partners. When one group of limited partners suffers an injury of $78.66 million so that the General Partner can receive a net benefit of $78.66 million, it seems to me that the limited partners have suffered a separate and distinct loss.

When the insider transfer involves the issuance of stock, Delaware cases have recognized the dual nature of the injury and the separate harm inflicted on the non-participating stockholders through the extraction of value.[46] In *Gentile*, the Delaware Supreme Court described these effects as follows:

---

be indifferent between $78.66 million owned directly and the same $78.66 million held through the entity. The General Partner naturally prefers cash. Extracting the $78.66 million is therefore worth more than leaving the same amount in the entity and benefiting indirectly.

[46] *See Gatz*, 925 A.2d at 1281 (concluding that transaction in which stockholder gained controlling position and public stockholders were diminished to a minority position were not exclusively derivative and could have been brought directly); *Gentile*, 906 A.2d at 90 (discussing dual attribute claims based on expropriation caused by a dilutive stock issuance); *Carsanaro*, 65 A.3d at 655 (discussing direct and derivative claims caused by a dilutive stock issuance); *Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *6-7 (Del. Ch. Jan. 14, 2010) (noting that claims alleging overpayment and subsequent common stock dilution are typically regarded as derivative but claims alleging that a controlling stockholder caused the corporation to overpay for stock thereby increasing the controllers ownership and decreasing minority stockholders' ownership are direct); *Dubroff I*, 2009 WL 1478697, at *3 ("*Gentile* and its progeny make clear that a shareholder's claim can be both derivative and direct in a unique situation: where a controlling shareholder causes the corporate entity to issue more equity to the controlling shareholder at the expense of the minority shareholders."); *Oliver v. Bos. Univ.*, 2006 WL 1064169, at *17 (Del. Ch. Apr. 14, 2006) (characterizing claim

A breach of fiduciary duty claim having [a] dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders. Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.

But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited. In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment—an

alleging equity dilution following a preferred stock issuance as a derivative claim but noting that "[v]oting power dilution may constitute a direct claim, because it can directly harm the shareholders without affecting the corporation, and any remedy for the harm suffered under those circumstances would benefit the shareholders"); *J.P. Morgan*, 906 A.2d at 818 (noting that dilution claims alleging the diminishment of voting power may be considered direct claims "where a significant stockholder's interest is increased at the sole expense of the minority" (quoting *In re Paxson Commc'n Corp. S'holders Litig.*, 2001 WL 812028, at *5 (Del. Ch. July 12, 2001))); *In re Triarc Cos., Inc.*, 791 A.2d 872, 874 (Del. Ch. 2001) (discussing direct and derivative claims resulting from the issuance of cash bonuses and stock options in excess of what was permitted by a stockholder approved compensation arrangement). *See generally* 3 Edward P. Welch et al., *Folk On The Delaware General Corporation Law* § 327.02[A][7] (6th ed. 2015).

entitlement that may be claimed by the public shareholders directly and without regard to any claim the corporation may have.

906 A.2d at 99-100 (footnotes omitted). The Delaware Supreme Court declined to categorize this type of claim as one for "dilution," adopting "a more blunt characterization—extraction or expropriation—because that terminology describes more accurately the real-world impact of the transaction upon the shareholder value and voting power embedded in the (pre-transaction) minority interest, and the uniqueness of the resulting harm to the minority shareholders individually." *Id.* at 102 n.26.

Subsequent cases have recognized that the principle recognized in *Gentile* was not limited to dilutive issuances involving majority stockholders; it applies equally to stock transfers involving significant stockholders.[47] Indeed, *Gentile*'s core insight applies to any insider stock issuance where the value transferred directly to the insider exceeds the share of the loss that the insider suffers through its stock ownership.[48]

---

[47] *See Gatz*, 925 A.2d at 1274 ("[W]here a *significant or controlling stockholder* causes the corporation to engage in a transaction wherein shares having more value than what the corporation received in exchange are issued to the controller, thereby increasing the controller's percentage of stock ownership at the public shareholders' expense, a separate and distinct harm results to the public shareholders, apart from any harm caused to the corporation, and from which the public shareholders may seek relief in a direct action." (emphasis added)); *Gentile*, 906 A.2d at 100 (describing doctrine as applying to a stockholder "having majority *or effective* control" (emphasis added)); *accord Loral*, 977 A.2d at 869 (quoting *Gentile*).

[48] *See Carsanaro*, 65 A.3d at 658; *accord In re Nine Sys. Corp. S'holder Litig.*, 2014 WL 4383127, at *27-28 (Del. Ch. Sept. 4, 2014); *see also Avacus P's. L.P. v. Brian*, 1990 WL 161909, at *6 (Del. Ch. Oct. 24, 1990) (Allen, C.) (holding under then-prevailing special injury test that stockholders could assert a direct claim where a board of directors issued stock to allegedly friendly holders).

Not only that, but the expropriation principle actually applies to insider transfers generally, regardless of whether the nature of the consideration received by the insider is cash, stock, or other corporate property. Whenever the value of the transfer to the insider exceeds the share of the loss that the insider suffers through its stock ownership, the insider transfer expropriates value from the unaffiliated investors. This effect happens precisely because the insider receives benefits to the exclusion of the other investors, resulting in a distinct injury to the other investors and a corresponding benefit to the insider.[49]

---

[49] Writing while a Vice Chancellor, Chief Justice Strine recognized the different benefits that inure to insiders from actions that in theory affect the corporation as a whole. *See In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 79 (Del. Ch. 1999). In *Gaylord*, the Chief Justice examined the ruling in *Moran v. Household International, Inc.*, 490 A.2d 1059 (Del. Ch.), *aff'd*, 500 A.2d 1346 (Del. 1985), which addressed whether a challenge to the adoption of a stockholder rights plan stated a derivative or individual claim. The *Moran* decision distinguished between a challenge to a rights plan deployed in the face of an active proxy contest, where the claim was deemed direct, and the use of a plan to defend against potential takeovers, where the claim was treated as derivative. In a typically incisive analysis, Chief Justice Strine exposed the lack of substance in this distinction, and he suggested that "there might be some practical and doctrinal utility to reconsidering whether properly pled *Unocal* claims should continue to be regarded as presumptively derivative, rather than individual, in nature." *Gaylord*, 747 A.2d at 77.

As part of his analysis, the Chief Justice responded to the argument that the adoption of a rights plan affected all stockholders equally, including insiders:

> If the derivative-individual distinction in *Moran* rests on the fact that defensive measures such as rights plans affect all stockholders equally, that distinction must deal with the reality that in most situations the directors and managers of the corporation hold shares. The inside holders' interests *qua* shareholders might not be affected all that differently by defensive measures, but their total economic interest in the corporation is often

The Delaware Supreme Court recognized this principle in *Tri-Star*, labeling it "cash-value dilution." *In re Tri-Star Pictures, Inc. Litig.*, 634 A.2d 319, 330 (Del. 1993). The plaintiffs in *Tri-Star* were former minority stockholders of Tri-Star Pictures, Inc. Through voting agreements with two other large shareholders, Coca-Cola Company effectively controlled 56.6% of Tri-Star's stock, and all seven of Tri-Star's directors were affiliated with Coca-Cola. The Delaware Supreme Court held that Coca-Cola was Tri-Star's controlling stockholder. *Id.* at 329. The plaintiffs challenged a transaction in which Coca-Cola transferred assets to Tri-Star with a book value of $745 million in exchange for shares of Tri-Star common stock valued at $900-$977 million (the "Asset Transfer"). After agreeing on the terms of the transaction, Coca-Cola wrote down the value of the transferred assets by nearly $200 million. The plaintiffs thus contended that Coca-Cola received consideration worth $900-$977 million in return for assets worth approximately $550 million.

---

> affected quite differently by defensive measures than are the interests of public stockholders having only an ownership stake. Hence, the justification for the *Unocal* standard of review. In addition, the inside holders have deprived only the non-inside stockholders of the right to freely receive purchase offers, since the insiders—in their capacity as directors— can decide to tear down the defenses when they themselves wish to accept such an offer.

*Id.* at 79. In other words, although the adoption of a rights plan might superficially affect all shares equally, it actually affects outsider stockholders differently and distinctly. If a comparable degree of realism is brought to bear on an insider transfer, similar principles reveal that the insider's "total economic interest in the corporation" is affected "quite differently" by the insider transfer. This difference in turn calls for recognizing the existence of a distinct injury to the unaffiliated stockholders.

After the transaction closed, Tri-Star was acquired by a third party, Sony USA, Inc., in a reverse triangular merger. As in this case, the defendants argued that the merger extinguished the plaintiffs' standing to sue because the challenge to the Asset Transfer was merely an overpayment claim that was derivative. The Court of Chancery agreed, reasoning that all of Tri-Star's stockholders suffered a proportionate loss from the overpayment.

The Delaware Supreme Court reversed, holding that the plaintiffs suffered two direct injuries. One of the injuries resulted from the consideration taking the form of stock, which inflicted the same type of injury later described in *Gentile*. For present purposes, the relevant part of the *Tri-Star* decision is its discussion of the second injury: cash-value dilution. The Delaware Supreme Court recognized that in substance, the Asset Transfer affected Coca-Cola and the non-participating stockholders differently because "[a]ny diminution in the . . . value of [Coca-Cola's shares] . . . was totally offset by the windfall profits plaintiffs allege Coca-Cola accumulated." *Id.* at 330. The non-participating stockholders only suffered the injury, without any offsetting benefit. As a result, "the practical effect" of the transaction was "to increase the value of the controlling stockholder's interest at the sole expense of the minority." *Id.* The Delaware Supreme Court incisively perceived that this type of injury was "quite different" from a case involving waste or mismanagement, where there is no offsetting transfer and the injury truly "diminishes the value of all stockholders' interests equally." *Id.* In the Asset Transfer, "Coca-Cola suffered no similar loss, but reaped a substantial profit." *Id.* at 332. Because of the transfer of value to the insider, the effect of the Asset Sale was to

"diminish the value of the minority interests" and inflict individual injury. *Id.* at 330. The Delaware Supreme Court concluded that in light of "the singular economic injury to minority interests alone, the minority have stated a cause of action" that was direct and survived the third party merger.[50]

In support of its analysis in *Tri-Star*, the Delaware Supreme Court went further and analogized the Asset Transfer to a squeeze-out merger governed by *Weinberger v. UOP, Inc.*, 457 A.2d 701 (1983). Conceptually, the comparison is a fair one. In each case, for purposes of Delaware law, the entity as a whole has a certain intrinsic value. In a squeeze-out merger, the controller takes the entity and leaves the stockholders with consideration ostensibly equal to their *pro rata* share. In a successful challenge to a squeeze-out merger, the minority stockholders prove that they received consideration having less value than their *pro rata* share. In an insider transfer, the situation is reversed. Rather than taking the entity, the controller takes the consideration. In a successful

---

[50] *Id.* at 332. On occasion, Court of Chancery decisions have recognized the distinct injury that an insider transfer imposes on a minority stockholder. *See Boyer v. Wilm. Mat'ls, Inc.,* 754 A.2d 881, 903 (Del. Ch. 1999) (crediting plaintiff's argument that he suffered individual injury and could sue directly where an insider transfer left the plaintiff "with his 25% interest in WMI, a worthless company, while defendants purchased the hot mix plant at an unfair price and simply continued WMI's business at a new location under a new corporate name"; relying on *Tri-Star* and regarding the existence of individual injury as "clear and requir[ing] little discussion"); *Fischer v. Fischer*, 1999 WL 1032768, at *3-4 (Del. Ch. Nov. 4, 1999) (relying on *Tri-Star* to hold that minority stockholder was injured distinctly and could sue individually following insider transfer of corporate asset in exchange for cash and a note, when corporation then failed to sue insider on the note); *see also Stevanov v. O'Connor*, 2009 WL 1059640 at *6 (Del. Ch. Apr. 21, 2009) (denying motion to dismiss because it was reasonably conceivable that plaintiff could prove individual injury based on insider transfers).

challenge to an insider transfer, the minority stockholders prove that the controller took more consideration than it should have, leaving the minority stockholders with less than their *pro rata* share of the entity. In both cases, the controller takes too much and leaves the minority stockholders with too little. In both cases, the controller extracts a benefit at the expense of the minority stockholders—in the cash out merger by paying the minority too little, and in the insider transfer by taking too much out of the entity. In both cases, the minority stockholders suffer an injury equal to the benefit to the controller.

An example with numbers may help. To illustrate the reciprocal nature of the two types of transactions, envision a corporation which, for purposes of Delaware law post-*Weinberger*, has an intrinsic value of $1 billion. The corporation has issued ten million shares, giving each share an intrinsic value of $100. Assume the controller owns 6,000,000 shares, with the remainder trading publicly at prices hovering around $85 per share. Further assume that the controller engages in a squeeze-out merger at $90 per share. To complete that transaction, the controller pays $360 million to the minority (4,000,000 x $90/share) to acquire shares worth $400 million (4,000,000 x $100/share). The minority stockholders lose $40 million in the transaction, and the controller receives an equivalent gain.

Now envision that instead of a squeeze-out merger, the controller owns another business that is just entering its expansion stage and is realistically worth $200 million. The controller takes a more aggressive view of its prospects and sells the business to the corporation for $300 million. The corporation has overpaid by $100 million, so it suffered harm in that amount. But the transaction did not affect all stockholders equally.

Although the controller lost $60 million indirectly because of its 60% interest in the corporation, the $100 million overpayment more than made up for it. On a net basis, the controller came out ahead by $40 million. The minority did not receive any offsetting benefit. Their 40% share of the overpayment was $40 million, which is the source of the value received by the controller.

In both cases, the minority suffered an injury of $40 million. In both cases, the controller benefitted by extracting $40 million from the minority. In both cases, the minority's injury was distinct and separate from both the injury the entity suffered and the benefit that the controller achieved. Given these effects, an insider transfer can be viewed as the flipside of a squeeze-out merger. Both transactions inflict a distinct injury on the non-participating stockholders in the form of expropriation. The only difference is whether the injured stockholders are kept in the entity or forced out.

Although *Tri-Star* and *Gentile* recognized the nature of the distinct injury that non-participating stockholders suffer, both were controversial. Given the potential for the principle recognized in *Gentile* to undercut the traditional characterization of stock dilution claims as derivative, some have understandably resisted its implications. *See, e.g.*, *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007) (seeking to avoid an interpretation of *Gentile* that "would swallow the general rule that equity dilution claims are solely derivative"), *aff'd*, 951 A.2d 727 (Del. 2008).

Both *Tri-Star* and *Gentile* notably involved the question of whether stockholders lost their standing to sue due to a merger under circumstances where the claim otherwise could be expected to "die as a matter of fact." *Golaine v. Edwards*, 1999 WL 1271882, at

70

*4 (Del. Ch. Dec. 21, 1999) (Strine, V.C.). Ruling in that context, both decisions reached outcomes that permitted the breach of fiduciary duty claims to continue, but those outcomes differed from how other cases had analyzed similar transactions for purposes of determining whether claims were derivative for purposes of Rule 23.1 and the demand doctrine.[51]

As I will suggest below, I believe that dual-natured claims should be analyzed differently for purposes of Rule 23.1 than for purposes of what happens to them in a merger. At present, in terms of the first prong of *Tooley*, it is enough to note that the injury from the Fall Dropdown affected both El Paso MLP and the non-participating limited partners. The Fall Dropdown superficially left the Partnership $171 million poorer, but it actually enriched the General Partner at the expense of the limited partners by reallocating $78.66 million from the limited partners to the General Partner. Those are distinct injuries, and the answer to *Tooley*'s first question is therefore "both."

### 2.    The Second Prong Of *Tooley*

Adapted to a limited partnership, the second prong of *Tooley* asks who would receive the benefit of any recovery or other remedy, the partnership or the limited

---

[51] *See, e.g., supra* note 2; *Del. Cty. Empls. Ret. Fund v. Sanchez*, --- A.3d ---, 2015 WL 5766264, at *1-2 (Del. Oct. 2, 2015) (characterizing a claim of "gross overpayment" by company as derivative for purposes of Rule 23.1); *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 768 (Del. 2006) (affirming dismissal of overpayment claim involving stock as derivative for purposes of Rule 23.1); *In re Paxson Commc'n Corp. S'holders Litig.*, 2001 WL 812028, at *5 (Del. Ch. July 12, 2001) (characterizing challenge to stock issuance as derivative for purposes of Rule 23.1).

partners individually? Just as the injury in this case operated at both the entity and the investor levels, so can the remedy.

As with the nature of the injury, the entity-level remedy is the most obvious. As long as El Paso MLP continued to exist as a separate legal entity, the harm that resulted from the General Partner's extraction of $171 million from El Paso MLP could be remedied by having the General Partner pay $171 million to El Paso MLP. The payment of $171 million to El Paso MLP parallels the remedy for a third party transfer and fixes the harm by returning the full amount to the entity.

Because of the dual nature of the injury, however, the entity-level remedy is not the only option. The General Partner could pay $78.66 million to the unaffiliated limited partners. That remedy focuses on the extraction of value from unaffiliated limited partners, but fixes the overall harm by recasting the transaction as one in which all partners receive *pro rata* treatment.[52]

---

[52] *See, e.g., Iroquois Master Fund Ltd. v. Answers Corp.*, 105 A.3d 989, 989 n.1 (Del. 2014) (TABLE) ("When a large stockholder . . . receives the same per share consideration as every other stockholder, that is ordinarily evidence of fairness, not of the opposite . . . ."); *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721-22 (Del. 1971) (holding that although a parent corporation caused its subsidiary corporation to pay a dividend, the dividend did not constitute self-dealing because minority stockholders received their proportionate share); *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 662 (Del. Ch. 2013) (Strine, C.) ("When a large stockholder . . . spreads the transactional consideration ratably across all stockholders, Delaware law does not regard that as a conflict transaction."); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1040 (Del. Ch. 2012) (Strine, C.) ("[W]hen a controlling stockholder . . . shares its control premium evenly with the minority stockholders, courts typically view that as a 'powerfu[l]' indication 'that the price received was fair.'" (quoting *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995))).

As with the analysis of the injury under *Tooley*, Delaware cases have recognized the availability of alternative remedies when dealing with insider transfers involving stock. When an insider has received too many shares for too little consideration, our decisions recognize that the harm can be addressed at either the entity level or the stockholder level. One remedy, of course, is to require the defendant to pay more to the corporation, fixing the underpayment by requiring a greater investment. This remedy parallels the possibility of having the General Partner repay $171 million to El Paso MLP in this case. But other remedies in stock dilution cases operate at the stockholder level, without any payment to the corporation, such as an order adjusting the rights of the stock or invalidating a portion of the shares.[53]

In my view, the answer to the second prong of *Tooley* is similar to the first. Just as the answer to the first question was "both," the answer to the second question is "either."

### 3. The Conclusion Under *Tooley* And Its Implications

Given the foregoing analysis under *Tooley*, the claim that gave rise to the Liability Award has a dual nature. Under current Delaware law, that means a plaintiff can pursue

---

[53] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 656-57 (Del. Ch. 2013) (explaining that a "remedy could operate at the stockholder level, without any payment to the corporation, by adjusting the rights of the stock or invalidating a portion of the shares"); *see also In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *32 (Del. Ch. Sept. 19, 2008) (reforming securities purchase agreement to convert preferred stock into non-voting common stock), *aff'd sub nom. Loral Space & Commc'ns, Inc. v. Highland Crusader Offshore P'rs, L.P.*, 977 A.2d 867 (Del. 2009); *Linton v. Everett*, 1997 WL 441189, at *7 (Del. Ch. July 31, 1997) (invalidating shares that directors issued to themselves for inadequate consideration).

the claim directly or derivatively. *See Loral*, 977 A.2d at 868. Brinckerhoff therefore can continue to sue for breach of the LP Agreement, and this court can implement the Liability Award through a *pro rata* recovery.

Although that holding is sufficient for purposes of this case, I believe that the treatment of dual-natured claims is one area where further jurisprudential development is warranted. In my view, Delaware law should not have two strains of cases that characterize similar injuries differently. Instead, Delaware law should distinguish openly between (i) how it treats dual-natured claims for purposes of Rule 23.1, demand, and other doctrines relevant to an on-going entity, and (ii) how it treats dual-natured claims for purposes of standing after a merger or other situation where the separate existence of the entity has terminated. The two situations implicate different policy considerations and should be treated differently. Acknowledging the difference removes the tension between the *Gentile/Tri-Star* line of authority and other decisions that have treated similar claims as derivative for purposes of Rule 23.1.

When considering how a dual-natured claim should be treated for purposes of Rule 23.1 and other doctrines that protect the board's central role in overseeing the business and affairs of the corporation, Delaware law can and should prioritize the derivative aspects of the claim. Classifying the claim as derivative for purposes of this stage of the litigation serves the policy goal of screening for meritless claims through a combination of the demand doctrine and the heightened pleading standards of Rule 23.1. These standards weed out weak claims while permitting strong claims involving breaches of the duty of loyalty to survive. Treating a dual-natured claim as derivative during this

74

stage also serves the pragmatic goal of ensuring that "injury to a whole association [of investors] is adjudicated on behalf of that whole and not just for the benefit of the individuals who have undertaken to pursue the claims." *In re Cencom Cable Income Partners, L.P.*, 2000 WL 130629, at *4 (Del. Ch. Jan. 27, 2000).

When considering how a dual-natured claim should be treated for purposes of whether it can be maintained after a merger, Delaware law can and should prioritize the individual aspects of the claim. The policies supporting a derivative characterization no longer apply once the separate legal existence of the represented entity has terminated. There is no need to screen again for weak claims, because the Rule 23.1 analysis already has served that purpose. Nor is there a continuing need for the entity to play its pragmatic role as a collection agent. In a merger, at the singularity of the effective time, the identities of the investors on whose indirect behalf the derivative action was being pursued become forever fixed. *See Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d 370, 383 (Del. Ch. 2010). The constituent entities know the identities of those investors because they send them the merger consideration. From that point on, a dual-natured claim "should be seen for what [it is], a form of class action." *Parfi Hldg. AB v. Mirror Image Internet*, 954 A.2d 911, 940 (Del. Ch. 2008) (Strine, V.C.).

There is also another public policy consideration: accountability. "The equitable standing of a stockholder to bring a derivative action on behalf of a corporation has long been grounded upon the interests of justice." *Schoon v. Smith*, 953 A.2d 196, 201 (Del. 2008). "It is important for shareholders to bring derivative suits because these suits, filed after the alleged wrongdoing, operate as an *ex post* check on corporate behavior."

75

*Seinfeld v. Coker*, 847 A.2d 330, 333 (Del. Ch. 2000). For purely derivative claims, however, the rule from *Lewis v. Anderson* causes the closing of a triangular merger to extinguish stockholder standing universally, regardless of the claims' merit.

> If derivative actions promote firm value, even marginally, then a rule that forecloses some number of both meritorious and meritless derivative actions will, all things being equal, inherently transfer some degree of wealth from corporations to the individuals who commit corporate wrongs. The resulting wealth transfer confers a windfall on faithless fiduciaries and creates perverse incentives for misbehavior.

*Hamilton P'rs, L.P. v. England*, 11 A.3d 1180, 1206 (Del. Ch. 2010). At the same time, the risk that a plaintiff will invest resources in a viable claim only to lose standing through a merger disincentivizes stockholders from engaging in monitoring under circumstances where it is already "likely that in a public corporation there will be less shareholder monitoring expenditures than would be optimum from the point of [view of] the shareholders as a collectivity." *Bird v. Lida, Inc.*, 681 A.2d 399, 403 (Del. Ch. 1996) (Allen, C.).

If the merger consideration compensated stockholders for lost derivative claims, then the wealth transfer would not exist and the windfall would not be a problem. But a related-party acquirer will not pay for the opportunity to recover from itself. That certainly was the case here, where the Proxy Statement recognizes that Merger consideration did not include any value for the claim that resulted in the Liability Award. Moreover, to the extent the related-party acquirer purports to price a claim against itself as part of the merger consideration, its judgment is self-interested and unreliable: "[T]he law, sensitive to the weakness of human nature and alert to the ever-present inclination to

76

rationalize as right that which is merely beneficial, will accord scant weight to the subjective judgment of an interested director concerning the fairness of transactions that benefit[] him." *Merritt v. Colonial Foods, Inc.,* 505 A.2d 757, 765 (Del. Ch. 1986) (Allen, C.); *accord Gottlieb v. Heyden Chem. Corp.*, 90 A.2d 660, 663 (Del. 1952) ("Human nature being what it is, the law, in its wisdom, does not presume that directors will be competent judges of the fair treatment of their company where fairness must be at their own personal expense."). For a dual-natured claim, the *Gentile/Tri-Star* approach provides a straightforward method for investors to continue to litigate only the disputed portion of value of the merger. The investors thereby receive a definitive answer from a court as to that element of the bundle of rights associated with their investment.

The principal alternative to the *Gentile/Tri-Star* approach is to treat the claims as derivative, then permit investors to file a new, secondary lawsuit challenging the merger that extinguished the stockholders' standing for failing to value those causes of action. In *Merritt*, Chancellor Allen followed that path for a related-party merger. Subsequently, the Delaware Supreme Court appeared to endorse that concept for mergers generally. *See Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1244-46 (Del. 1999). Since *Parnes*, a number of Delaware decisions have addressed secondary lawsuits of this type.[54]

---

[54] *See, e.g., In re Primedia, Inc. S'holder Litig.*, 67 A.3d 455, 477-90 (Del. Ch. 2013) (denying motion to dismiss secondary challenge to merger based on extinction of standing to litigate pending derivative claim); *In re Massey Energy Co.*, 2011 WL 2176479, at *2-4 (Del. Ch. May 31, 2011) (Strine, V.C.) (considering secondary action in which plaintiffs challenged merger because it would extinguish their standing to litigate pending derivative claim; denying preliminary injunction to enjoin transaction); *Kohls v.*

It might be that for true derivative claims, there is no alternative to the lengthier and indirect route of a secondary lawsuit challenging the merger. For dual-natured claims, however, the *Gentile/Tri-Star* approach is superior. To my mind, it better reflects the economic realities of a merger, and it results in a more efficient litigation framework.

From the standpoint of economic realism, the *Gentile/Tri-Star* framework appropriately recognizes that a related-party acquirer does not pay for the right to recover from itself, as was admittedly the case here. Third-party acquirers don't pay for derivative claims against sell-side management either.

For purposes of evaluating this proposition, it is helpful to divide the litigation assets that an acquirer might purchase and assert into two categories: (i) external claims against third parties, such as contract claims, tort claims, and similar causes of action ("External Claims") and (ii) internal claims against sell-side managers ("Internal Claims"), such as the claim that gave rise to the Liability Award.[55] There is no reason to think either that the acquirer would not determine disinterestedly whether to assert the External Claims or that the merger price would not incorporate an assessment of the

---

*Duthie*, 765 A.2d 1274, 1284-85 (Del. Ch. 2000) (same; noting that Court previously denied motion to dismiss the merger challenge); *see also Brinckerhoff*, 986 A.2d at 386-96 (assessing strength of derivative claims for which standing was extinguished by merger when evaluating fairness of settlement); *In re Countrywide Corp. S'holders Litig.*, 2009 WL 846019, at *8 (Del. Ch. Mar. 31, 2009) (same).

[55] *See Primedia*, 67 A.3d at 483-84; Note, *Survival of Rights of Action After Corporate Merger*, 78 Mich. L. Rev. 250, 263-70 (1979) [hereinafter Survival of Rights].

value of those claims.[56] By contrast, there is ample reason to think that an acquirer would never assert, and therefore would not pay for, Internal Claims.[57] "Acquirers buy businesses, not claims," and "[m]erger-related financial analyses focus on the business, not on fiduciary duty litigation." *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 664 (Del. Ch. 2013). There are also human dynamics at work that make suits against sell-side managers improbable:

> The acquiring company has just purchased the target company in a process run by the same directors and officers who the acquiring corporation would be suing. Would the deal have happened if the directors and officers thought they would face a suit from the buyer? For companies who regularly make acquisitions, a reputation for pursuing claims against sell-side fiduciaries would not help their business model. Moreover, directors of the acquired corporation may join the combined entity's board, and senior officers of the acquired company may become part of the ongoing management team. Those individuals would become defendants in the acquirer's lawsuit.

*Id.* And there are legal impediments. The acquirer may have agreed contractually as part of the deal documents not to sue the sell-side managers.[58] More likely, the acquirer will have committed to maintain the sell-side managers broad indemnification and

---

[56] *See Primedia*, 67 A.3d at 483-84; Survival of Rights, *supra*, at 263-66.

[57] *Golaine v. Edwards*, 1999 WL 1271882, at \*5 (Del. Ch. Dec. 21, 1999) (Strine, V.C.) (noting that such claims "usually die as a matter of fact"); *Penn Mart Realty Co. v. Perelman*, 1987 WL 10018, at \*2 (Del. Ch. Apr. 15, 1987) ("I agree that it is highly unlikely that Pantry Pride, which now controls Revlon, will seek to redress the allegedly excessive severance payments or allegedly excessive fees and therefore these abuses (if they are abuses) are not likely to be addressed.").

[58] *See Golaine*, 1999 WL 1271882, at \*4 (noting the acquirer could give up the right to sue "in the merger agreement"); *Bershad v. Hartz*, 1987 WL 6092, at \*3 (Del. Ch. Jan. 29, 1987) (same).

advancement rights or provide even broader third party rights.[59] An acquirer who sued would foot the bill for both sides, making litigation economically unattractive.

Given these factors, the premise that Internal Claims should transfer to the acquirer in a merger because the acquirer has paid for them is a counter-factual fiction. The acquirer has paid for and should receive External Claims. The acquirer has not paid for and will not assert the Internal Claims. The acquirer is most likely to treat any pending Internal Claims against the sell-side managers "as done" and focus instead on "mov[ing] forward" with the business. *Massey Energy*, 2011 WL 2176479, at \*26 n.173. As a result, those claims "usually die as a matter of fact." *Golaine*, 1999 WL 1271882, at \*4.

The *Gentile/Tri-Star* framework also appropriately realizes that as between the sell-side stockholders and the acquirer, the equities favor channeling any recovery from the Internal Claims to the sell-side stockholders. A line of cases culminating in the United States Supreme Court's decision in *Bangor Punta* recognizes this point. *See Bangor Punta Operations v. Bangor & A. R. Co.*, 417 U.S. 703 (1974). There, the United States Supreme Court reasoned that when sell-side managers had extracted excessive value

---

[59] *See, e.g., Homestore, Inc. v. Tafeen*, 888 A.2d 204, 212 (Del. 2005) ("[M]andatory advancement provisions are set forth in a great many corporate charters, bylaws and indemnification agreements."); *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1179-80, 1180 n.8 (Del. Ch. 2007) (noting arms' length, third party stock-for-stock merger agreement provided significant protections for directors and officers of acquired company who were defendants in then-pending derivative actions, including direct contractual indemnification from the acquirer).

from their business before the acquisition, they depressed the value of the business, so the acquirer ended up paying less to buy it. Having purchased the business for less, the acquirer got what it paid for. The acquirer therefore had no equitable right to sue the sell-side managers, recoup a portion of its purchase price, and effectively re-trade the deal. *Id.* at 710-11. Notably, under *Bangor Punta* and its predecessors, *this rule applied to the acquirer both as the owner of the new business and to the extent the acquirer sought to have the business assert the claim itself.*[60] At the same time, the *Bangor Punta* doctrine did not leave the acquirer without remedies. If the acquirer believed it bought a lemon or was otherwise aggrieved by its deal, it could sue in contract under its acquisition agreement or, in an extreme case, for fraud. The only thing the acquirer could not do was assert what had been sell-side Internal Claims.

To illustrate this concept, recall our example of the Delaware corporation with an intrinsic value of $1 billion. Assume that the controller caused the corporation to pay $300 million for the expansion-stage company that was legitimately worth $200 million. Given that the purchasing corporation was harmed by $100 million, an arms' length acquirer should only pay $900 million for the entity. In the resulting transaction, the

---

[60] *Id.* at 713; s*ee also Midland Food Servs., LLC, v. Castle Hill Hldgs. V, LLC*, 792 A.2d 920, 929-35 (Del. Ch. 1999) (Strine, V.C.) (explaining and applying the *Bangor Punta* doctrine); *Golaine*, 1999 WL 1271882, at *4 n.16 ("Depending on the circumstances, the new acquiror may be barred from causing the target corporation [to sue its former fiduciaries] under . . . the [*Bangor Punta*] doctrine."); *Courtland Manor, Inc. v. Leeds*, 347 A.2d 144, 147 (Del. Ch. 1975) (same). *But see Lewis v. Anderson*, 477 A.2d 1040, 1050-51 (Del. 1984) (declining to apply *Bangor Punta*).

acquirer gets what it paid for: a business worth $900 million. The parties that suffered harm from this combination of transactions are the sell-side minority stockholders. They are the parties from whom the controller extracted $40 million through the interested sale of the expansion-stage company. In this setting, the *Bangor Punta* doctrine bars the acquirer from re-trading its deal under the guise of having the acquired corporation assert an entity-level claim against the controller. Under *Gentile* and *Tri-Star*, the claim for expropriation has a dual nature, so it properly remains with the injured sell-side stockholders, who can continue to maintain their suit against the sell-side controller. For dual-natured claims, the *Gentile/Tri-Star* approach operates in harmony with a faithful application of the *Bangor Punta* doctrine. Because of *Gentile/Tri-Star*, the sell-side investors can continue to pursue their dual-natured claims post-merger. Because of the *Bangor Punta* doctrine, the acquirer and the acquired entity cannot assert similar claims.

The *Gentile/Tri-Star* approach also has significant practical advantages. First, it avoids "the graceless creature of a suit within a suit," which a secondary action challenging the merger necessarily generates. *Merritt v. Colonial Foods, Inc.,* 505 A.2d 757, 766 (Del. Ch. 1986) (Allen, C.). Under the *Parnes/Merritt* approach, rather than having the original parties continue to litigate the underlying action and obtain an answer to the claim that was properly at issue in that lawsuit, the investor plaintiffs must start over and litigate those issues indirectly in the guise of a secondary action challenging the merger. That process often involves expert testimony about what might have happened if the original action had continued. Rather than speculating about what might have happened if the original action had continued, it seems more efficient to allow the

original action to continue. For dual-natured claims, the *Gentile/Tri-Star* framework adopts this more straightforward approach.

Second, the *Parnes/Merritt* approach expands the scope of the litigation and introduces additional and unnecessary transaction costs. Because the secondary lawsuit challenges the merger, it no longer focuses only on the Internal Claim that was being pursued pre-merger. The secondary lawsuit opens up to discovery and eventual judicial scrutiny the merger as a whole and the process leading up to it. Areas of discovery and legal issues that might never have been litigated in the original action now must be litigated as part of the secondary claim. If no one legitimately disputes the value that the transaction placed on the operating business, then the expanded litigation is wasteful and unnecessary. Here, for example, Brinckerhoff does not currently challenge the consideration provided in the Merger to the extent it valued El Paso MLP's operating business. At present, Brinckerhoff only objects to the fact that he received no value for the Liability Award. It seems wasteful and unnecessary to start a new and more expansive lawsuit just so Brinckerhoff could litigate indirectly the same claim that already has been tried. The *Gentile/Tri-Star* approach enables the investor-plaintiffs to continue litigating the narrow claim they originally pursued without having to expand their litigation into a broader and potentially unnecessary inquiry into other aspects of the merger.

Third, the fact that the secondary action focuses on the adequacy of the merger consideration introduces a potential defense that also must be litigated: the argument that the potential recovery on the extinguished claim is immaterial and should be ignored.[61] In addition to making the secondary litigation more complex, this defense potentially insulates insider transfers that may divert significant wealth from investors. The standard for materiality varies, but in a large deal priced in the billions, a materiality-based exclusion can encompass quite a bit.

The current case provides an example of how materiality can be raised as a defense to insulate potentially large insider transfers from challenge. The General Partner already has suggested that the $171 million Liability Award was not material in the context of the $6 billion Merger. Brinckerhoff disagrees, but the General Partner's position on materiality is not a frivolous one. Personally, I believe Brinkerhoff has the stronger of the argument, because the *pro rata* value of the Liability Award, plus interest, approximates 2.8% of the value of the Merger consideration that the unaffiliated holders of common units received. Then-Chancellor Strine's approval of a settlement in litigation challenging Kinder Morgan's acquisition of El Paso Parent supports Brinckerhoff's

---

[61] *Compare Massey Energy*, 2011 WL 2176479, at *29 (noting that the court was unable to conclude, after reviewing an extensive evidentiary record, that it was "probable that the Derivative Claims have a value that is material in relation to the value of Massey as an entity") *with Primedia*, 910 A.3d at 259 (concluding for purposes of a motion to dismiss that it was reasonably conceivable that the value of a derivative claim for which standing had been extinguished in a merger was material in the context of what the minority stockholders received).

position. There, the Chief Justice regarded a cash settlement payment equal to approximately one-half of one percent of the merger consideration as "a very large monetary settlement," "a very substantial achievement for the class," "real money," and a "very good settlement for the class."[62] The value of the $171 million Liability Award also ranks as one of the largest aggregate recoveries that investors have obtained from the Court of Chancery.[63] Nevertheless, the fact that the General Partner can argue that the Liability Award should be disregarded as immaterial illustrates the magnitude of self-dealing that the *Parnes/Merritt* approach could permit.

In my view, the Delaware Supreme Court's decisions in *Gentile* and *Tri-Star* appropriately balance the various equitable and practical considerations by permitting a

---

[62] *See* Transcript of Settlement Hearing at 36-37, 39-40, *In re El Paso Corp. S'holder Litig.*, C.A. No. 6949-CS (Del. Ch. Dec. 3, 2012). I learned of this ruling from a scholarly and insightful article that examines how the rule of *Lewis v. Anderson* extinguishes potentially valuable claims and argues for a different approach. *See* S. Michael Sirkin, *Standing at the Singularity of the Effective Time: Reconfiguring Delaware's Law of Standing Following Mergers and Acquisitions*, 69 Bus. Law 429, 447 (2014). I agree with the article's diagnosis of the patient, but part ways with aspects of the treatment that it prescribes. At the risk of oversimplification, the article proposes that Delaware law embrace *Parnes/Merritt* and rely on secondary actions challenging mergers as a means of preserving the value of lost derivative claims. For the reasons set forth in the text, and at least for dual-natured claims, I regard that route as a second-best alternative to *Gentile/Tri-Star.*

[63] *See* Tom Hals, *Delaware Judge Hits El Paso Pipeline Deal with $171 Mln Judgment*, Reuters (Apr. 20, 2015), http://reut.rs/1El3J2a; *see also* Bradley R. Aronstam & S. Michael Sirkin, *Post-Closing Litigation Risk in M&A Actions*, INSIGHTS, May 2012, at 9; Kevin LaCroix, *Largest Derivative Lawsuit Settlements,* The D&O Diary (Dec. 5, 2014), http://www.dandodiary.com/2014/12/articles/shareholders-derivative-litigation/largest-derivative-lawsuit-settlements/.

limited category of claims with some derivative characteristics to continue to be litigated as direct claims following a merger. Those claims involve insider transfers that traditionally implicate the duty of loyalty where the cost of extinguishing the plaintiffs' standing to sue is high. At the same time, the *Gentile*/*Tri-Star* approach preserves the general rule of *Lewis v. Anderson*, which is particularly appropriate for External Claims.

Although I personally think that the *Gentile*/*Tri-Star* framework correctly perceives the dual nature of cases involving insider transfers, I believe that the implications of that analysis should be limited to the question of whether a stockholder can continue to litigate a dual-nature claim after a merger or similar transaction that otherwise would extinguish the plaintiffs' standing to sue. Once so limited, the *Gentile*/*Tri-Star* analysis need not seep back to undermine the policies served by the demand doctrine and Rule 23.1.

In the current case, for as long as El Paso MLP retained its separate legal existence, it was preferable for the action to proceed in the name of El Paso MLP and for any remedy to run through El Paso MLP. Now that El Paso MLP no longer exists as a separate entity, the possibility of remedying the situation through a payment to the entity no longer exists. In my view, that does not mean that the harm no longer exists or that a remedy is no longer warranted. The Proxy Statement admits that the consideration that holders of common units received in the Merger did not incorporate any value for this litigation. Under the circumstances, it does not seem logical or equitable to disregard the Liability Award, dismiss this action, and invite the plaintiff potentially to start all over again by challenging the Merger. Rather, it seems to me that the remedy should be

86

implemented differently. I believe that the direct aspects of the remaining breach of contract claim should enable the unaffiliated limited partners to receive their *pro rata* share of the Liability Award.

## C.      Third Order Analysis: Estoppel

So far, the decision has concluded for two separate reasons that the Merger did not extinguish Brinckerhoff's standing to enforce the Liability Award. First, if the General Partner is correct about the court having to characterize the claim as either direct or derivative, then the claim is a direct claim for breach of contract. Second, if the *Tooley* test applies, then the claim has dual attributes that enable Brinckerhoff to continue to pursue it notwithstanding the Merger. Anticipating these conclusions, the General Partner argues that Brinckerhoff should be estopped from contending that his lawsuit is anything other than derivative.

The General Partner does not clearly articulate which species of estoppel ostensibly applies. In substance, the General Partner argues that it justifiably relied on Brinckerhoff's characterization of his claim and suffered prejudice as a result. One can safely assume that estoppel requires some form of representation (or promise) plus prejudicial reliance.[64] Here, neither is present.

---

[64] *See Haveg Corp. v. Guyer*, 226 A.2d 231, 236-37 (Del. 1967) (describing promissory estoppel in terms of a promise plus reasonable reliance on it); *Wilson v. Am. Ins.*, 209 A.2d 902, 903-04 (Del. 1965) (describing equitable estoppel in the form of conduct suggesting a certain state of facts on which another reasonably relied to his detriment); *Norman v. Paco Pharm. Servs., Inc.*, 1992 WL 301362, at *4 (Del. Ch. Oct. 21, 1992) (framing alternative formulations of judicial estoppel as encompassing a

### 1. No Reliance Interest In Brinckerhoff's Characterizations

For starters, estoppel requires that a party have justifiably relied on some conduct or representation by another party. It is true that Brinckerhoff originally labeled his claim as derivative in his Complaint and did not waiver from a derivative characterization until Kinder Morgan announced the Merger. He also sought an entity-level remedy in his Complaint, continued to frame the injury as one to El Paso MLP during discovery and in his expert report, and described the injury in those terms at trial. For purposes of estoppel, however, the General Partner lacked any reliance interest in Brinckerhoff's characterizations, because Delaware law makes clear that they are not binding on the court.

Brinckerhoff's characterization of his claim as derivative in his Complaint did not give rise to any reliance interest on the part of the General Partner. "To determine whether a complaint states a derivative or an individual cause of action, [a court] must look to the nature of the wrongs . . . , not to the plaintiff's designation or stated intention." *Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1078 (Del. 1986). The court is "not bound by the designation employed by the plaintiff."[65] In light of these legal principles,

---

representation to the court together with either detrimental reliance by the other party or a ruling from the court based on the prior representation).

[65] *Anglo Am. Sec. Fund LP v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143 (Del. Ch. 2003); s*ee also Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1069-70 (Del. Ch. 1985); *accord In re Cencom Cable Income P'rs, L.P. Litig.*, 2000 WL 130629, at *3 (Del. Ch. Jan. 27, 2000).

the General Partner could not have reasonably relied on Brinckerhoff's characterization of his claim.

The same is true for Brinckerhoff's proposed remedy. This court has "broad discretion to tailor a remedy to suit the situation as it exists." *Gilliland v. Motorola, Inc.*, 873 A.2d 305, 312 (Del. Ch. 2005). The "protean power of equity" allows a court to "fashion appropriate relief," and a court "will, in shaping appropriate relief, not be limited by the relief requested by plaintiff." *Texas Instruments Inc. v. Tandy Corp.*, 1992 WL 103772, at \*6 (Del. Ch. May 12, 1992) (Allen, C.). "Unlike its extinct English ancestor, the High Court of Chancery of Great Britain, Delaware's Court of Chancery has never become so bound by procedural technicalities and restrictive legal doctrines that it has failed the fundamental purpose of an equity court—to provide relief suited to the circumstances when no other remedy is available at law." William T. Quillen & Michael Hanrahan, *A Short History of the Delaware Court of Chancery: 1792-1992*, *in* Court of Chancery of the State of Delaware: 1792-1992 21, 22 (1992).

"When equity takes jurisdiction of a cause and decides that relief shall be granted, the relief, including damages, if any, will be tailored to suit the situation as it exists on the date the relief is granted and the choice of relief is largely a matter of discretion with the trial judge." *Guarantee Bank v. Magness Constr. Co.*, 462 A.2d 405, 409 (Del. 1983) (holding that the Court of Chancery did not err in awarding a remedy that diverged from the parties' stipulated facts).

> Fundamentally, once a right to relief in Chancery has been determined to exist, the powers of the Court are broad and the means flexible to shape and adjust the precise relief to be granted so as to enforce particular rights and

89

liabilities legitimately connected with the subject matter of the action. It is necessary for the Court to adapt the relief granted to the requirements of the case so as to give to the parties that to which they are entitled.

*Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 580 (Del. 1964) (citations omitted). "The choice of relief to be accorded a prevailing plaintiff in equity is largely a matter of discretion with the Chancellor, and Delaware, with its long history of common law equity jurisprudence, has followed that tradition." *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 500 (Del. 1981) (citations omitted), *overruled on other grounds*, *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983). Because the court, not the plaintiff, shapes the remedy, the General Partner could not have reasonably relied on Brinckerhoff's characterization of the appropriate remedy.

### 2. No Prejudice From A Remedy That Could Be Awarded In A Derivative Action

Next, estoppel requires that the party asserting it have suffered some prejudice. Inherent in the General Partner's claim of prejudice is the notion that a derivative cause of action can never support a *pro rata* recovery, such that a *pro rata* recovery in this case prejudices the General Partner. It is certainly true that the recovery in a derivative action generally goes to the entity,[66] but that rule is not absolute.[67] As treatise authors[68] and

---

[66] *See*, *e.g.*, 13 Fletcher Cyclopedia of Corporations § 6028, at 323 (rev. ed. 2013) ("Any recovery in a derivative proceeding generally belongs to the corporation and not to the plaintiffs or other shareholders."); Robert C. Clark, *Corporation Law* § 15.1, at 639 (1986) ("Ordinarily . . . any damages recovered in the suit are paid to the corporation.").

[67] *Eshelman v. Keenan*, 194 A. 40, 43 (Del. Ch. 1937) (Wolcott, C.) (endorsing and applying general rule of an entity-level recovery where a derivative claim is brought

on behalf of a profitable corporation operating as a going concern, but positing that circumstances could support a *pro rata* recovery, such as if "the corporation had ceased to operate, its controlling stockholder had converted all of its assets and it was denuded of all of its property"), *aff'd*, 2 A.2d 904, 912 (Del. 1938) (affirming general rule of entity-level recovery while allowing for possibility of *pro rata* recovery in "exceptional cases"); *see also In re Cencom Cable Income P'rs, L.P. Litig.*, 2000 WL 130629, at *1-3 (Del. Ch. Jan. 27, 2000) (permitting individual recovery by limited partner where partnership had dissolved and "superimposing derivative pleading requirements upon claims needlessly delays ultimate substantive resolution and serves no useful or meaningful public policy purpose"); *Fischer v. Fischer*, 1999 WL 1032768, at *1, 3 (Del. Ch. Nov. 4, 1999) (permitting individual recovery on overpayment claim and waste claim where defendants were also stockholders such that an entity-level recovery would put the plaintiff in the "awkward position" of requesting relief that would benefit the defendants); *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 82 (Del. Ch. 1999) (Strine, V.C.) (recognizing that the adoption of a rights plan would affect different types of stockholders differently and suggesting that characterizing the claim as derivative could prevent the stockholders who were also defendants from benefitting from their wrongdoing by "awarding relief to the class of innocent stockholders"); *Boyer v. Wilm. Mat'ls, Inc.,* 754 A.2d 881, 903 (Del. Ch. 1999) (permitting individual recovery where majority stockholders purchased corporate assets for inadequate consideration and continued business to exclusion of minority stockholder). *See generally* Heyman & Enerio, *supra*, at 178-85 (discussing implications of Delaware cases that contemplated individual recoveries on claims traditionally viewed as derivative).

[68] *See*, *e.g.*, Henry Winthrop Ballantine, Ballantine on Corporations § 143, at 336 (Rev. ed. 1946) ("In certain situations recovery may be allowed by the plaintiff of his individual damages in a representative suit on a corporate right of action in lieu of the corporate recovery."); 3A Fletcher, *supra*, § 1342, at 577 ("The decree may, in a proper case, order payment directly to the complaining shareholder or creditor, but ordinarily, where the right to recover is as the representative of the corporation, the damages should be ordered paid to the corporation."); Ernest L. Folk, III, The Delaware General Corporation Law: A Commentary and Analysis 455 (1972) ("It is true that 'exceptional cases' may arise where it is equitable to enforce recovery against the wrongdoing defendants 'in an amount sufficient to satisfy non-assenting stockholders measured by their stockholdings.'" (quoting *Keenan v. Eshelman*, 2 A.2d 904 (Del. 1938))); William J. Grange, Corporation Law for Officers and Directors 328-29 (5th ed. 1946) ("[I]n some exceptional cases, . . . the court may order the money or property recovered distributed directly to the stockholders in proportion to their holdings."); 2 George D. Hornstein, Corporation Law & Practice § 602, at 101 (1959) (citing examples where court gave an individual recovery to stockholders on a derivative claim and concluding that "[t]he

commentators[69] have noted, courts will grant *pro rata* recovery where the equities

demand it. Indeed, one of the earliest English cases to recognize the viability of a

moral to be drawn from these exceptions to the general rule is that treatment of the corporation as a separate legal entity will not be permitted if it will interfere with the court's doing justice to human beings"); Christine Rohrlich, Law and Practice in Corporate Control 146-47 (1933) ("Under exceptional circumstances the plaintiffs may receive directly their proportionate interest in any recovery which would ordinarily go to the corporation."); Robert S. Stevens, Handbook on the Law of Private Corporations § 162, at 662 (1936) ("The third class of cases in which a shareholder may recover his individual loss includes those . . . though the injury is one which may be termed corporate, the courts have, in fixing the amount of recovery, looked at the realities of the corporate structure, and have protected those shareholders who have been actually injured and were deserving of reimbursement."); 6 Seymour D. Thompson & Joseph W. Thompson, Commentaries on the Law of Corporations § 4571, at 466 (3d ed. 1927) ("Where, however, in awarding recovery to the corporation it would result in stockholder receiving a portion thereof to which he was not entitled, a court of equity may look beyond the corporation and decree the recovery to those stockholders entitled to it.").

[69] *See*, *e.g.*, Richard A. Booth, *A Note On Individual Recovery In Derivative Suits*, 16 Pepp. L. Rev. 1025, 1025 (1989) ("There have been . . . a few important cases in which the courts have held that it is the individual shareholders who may recover."); Gail Gutsein, *Railroad May Prosecute Corporate Cause of Action, Despite Lack of Stockholder Injury, to Vindicate Public Interest*, 74 Colum. L. Rev. 528, 530 n.11 (1974) ("This [*pro rata*] approach, while not unique, is rejected in the vast majority of cases."); Mary Elizabeth Matthews, *Derivative Suits and the Similarly Situated Shareholder Requirement*, 8 DePaul Bus. L.J. 1, 1 n.1 (1995) ("[R]ecovery may be awarded to the shareholders pro rata in limited instances."); John W. Welch, *Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation*, 9 J. Corp. L. 147, 181 (1984) ("[I]in a few cases, courts have ordered that the judgment be paid directly to the shareholders, even while reaffirming the derivative nature of the proceeding."); Barbara E. Bruce, Note, *Equitable Principles Applicable To The Issue Of Standing*, 16 B.C. Indus. & Comm. L. Rev. 525, 536 (1974) ("There are a number of cases where pro-rata recovery has been awarded because the circumstances dictate that to do otherwise would be inequitable."); *id.* at 1319 (describing the view that individual relief can never be awarded on a derivative claim as "overly restrictive" but recommending that "courts should proceed cautiously in decreeing pro rata recovery"); Note, *Equitable Considerations in Suits by Corporations Against Former Controlling Shareholders*, 88 Harv. L. Rev. 227, 231 (1974) ("Courts have created exceptions to the

derivative claim rejected the contention that an individual recovery would never be permitted:

> If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual [stockholders] in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the . . . claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

*Foss v. Harbottle*, 67 Eng. Rep. 189, 202 (Ch. 1843). *See generally* Raoul Berger, *"Disregarding The Corporate Entity" For The Stockholders' Benefit*, 55 Colum. L. Rev. 808 (1955). The rule requiring the corporation to sue and receive the recovery "must always yield to the requirements of equity, and is cast aside in view of the fact that the

---

rule" that "minority shareholders cannot obtain pro rata recovery on a corporate cause of action."); Note, *Personal Recovery By Shareholders For Injury To The Corporation*, 2 U. Chi. L. Rev. 317, 321 (1935) [hereinafter Personal Recovery] ("In some circumstances . . . , courts have granted recovery to a shareholder *in lieu of* corporate recovery."); Note, *Situations Where Pro Rata Recovery Is Granted*, 69 Harv. L. Rev. 1314, 1314 (1956) [hereinafter Situations] ("In certain circumstances, however, some courts have given the recovery in derivative suits to individual stockholders."); *cf.* Edward J. Grenier, *Prorata Recovery by Shareholders on Corporate Causes of Action as a Means of Achieving Corporate Justice*, 19 Wash. & Lee L. Rev. 1165, 1201 (1962) ("[P]rorata recovery, under certain circumstances, provides a useful and desirable method for redressing wrongs to the corporation. Through it, the derivative suit is likely to become a far more refined instrument for achieving corporate justice."); William D. Harrington, *Business Associations*, 42 Syracuse L. Rev. 299, 339 (1991) ("Justice would have been better served if the court had adopted the pro rata recovery rule, or at least taken more trouble to explain why it was rejecting it.") Comment, *Corporations— Shareholders' Derivative and Direct Actions—Individual Recovery*, 35 N.C. L. Rev. 279, 284 (1957) [hereinafter Individual Recovery] ("From the above, it can be seen that courts have refused to be restrained by lack of precedents where inequitable results would be reached if they followed the general rule [of only permitting an entity-level recovery].").

stockholders are the real beneficiaries *whenever the usual course is not open.*" *Home Fire*

*Ins. Co. v. Barber*, 93 N.W. 1024, 1033 (Neb. 1903) (Pound, C.) (emphasis added).

Because the derivative action is fundamentally an equitable proceeding, the court

has the power to craft a remedy that is appropriate based on the specific facts and equities

of the case.[70] For a corporate claim, that most often means a corporate remedy, but not

always. Seeking to generalize from the various precedents, commentators have identified

recurring scenarios that can support an investor-level recovery on an entity-level claim.[71]

Three have particular salience for this case:

- Cases where the defendants are insiders who misappropriated corporate property such that an entity-level recovery would return the property to the wrongdoers' control.[72]

---

[70] *See Schoon v. Smith*, 953 A.2d 196, 201 (Del. 2008) (describing equitable roots of derivative action); *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 176 (Del. 2002) ("[T]he Court of Chancery's 'powers are complete to fashion any form of equitable and monetary relief as may be appropriate.'"); *Hanby v. Wereschak*, 207 A.2d 369, 370 (Del. 1965) ("[T]he Court of Chancery [has] the inherent powers of equity to adapt its relief to the particular rights and liabilities of each party . . . .").

[71] Different commentators group the cases differently. *See*, *e.g.*, 13 Fletcher, *supra*, § 6028, at 325 (identifying six recurring fact patterns in which "[c]ourts have been willing to award a pro rata recovery to shareholders"); Grenier, *supra*, at 167 (identifying four typical scenarios in which "prorata recovery on a corporate cause of action has been decreed); Bruce, *supra*, at 536 n.79 (identifying "three fact situations predominantly involved" in opinions where pro rata recovery has been ordered); Individual Recovery, *supra*, at 280 ("[I]n at least two general classes of cases, the shareholder has been allowed to recovery directly."); Situations, *supra*, at 1314 (observing that "[c]ourts have decreed pro rata recovery in three principal situations").

[72] 13 Fletcher, *supra*, § 6028, at 325 ("when the defendants hold a controlling interest in the corporation"); Grenier, *supra*, at 167 ("to protect shareholders from dissipation of a corporate recovery because of foreseeable future mismanagement by the

defendants, who will remain in control of the corporate affairs"); Bruce, *supra*, at 536 n.79 ("when the corporate action is against insiders who have appropriated funds in order to prevent funds disgorged from the wrongdoers from reverting to their control"); Individual Recovery, *supra*, at 280 (noting that where insiders have misappropriated funds, individual recovery by non-participating stockholders has been allowed); Situations, *supra*, at 1314 ("Where the derivative action is against insiders who have appropriated corporate funds, courts have sometimes decreed individual awards to prevent the funds disgorged by the wrongdoers from reverting to their control.").

For illustrative Delaware cases, see *In re Cencom Cable Income P'rs L.P. Litig.*, 2000 WL 130629, at *5-6 (Del. Ch. Jan. 27, 2000) (permitting direct challenge to transaction in which general partner purchased assets of limited partnership, then caused entity to dissolve); *Boyer v. Wilm. Mat'ls, Inc.,* 754 A.2d 881, 903 (Del. Ch. 1999) (crediting plaintiff's argument that he suffered individual injury and could sue directly where an insider transfer left the plaintiff "with his 25% interest in WMI, a worthless company, while defendants purchased the hot mix plant at an unfair price and simply continued WMI's business at a new location under a new corporate name"); *Fischer v. Fischer*, 1999 WL 1032768, at *1, *3-4 (Del. Ch. Nov. 4, 1999) (permitting individual recovery where defendants controlled entity, sold key asset to themselves in return for cash and a note, distributed the cash, and then caused the entity not to pursue recovery on the note); *see also Stevanov v. O'Connor*, 2009 WL 1059640 at *6 (Del. Ch. Apr. 21, 2009) (denying motion to dismiss because it was reasonably conceivable that plaintiff could prove individual injury based on insider transfers). *See generally* Heyman & Enerio, *supra*, at 181-83 (describing a possible "unjust enrichment exception" under which "plaintiffs could pursue direct claims, rather than derivative claims, in order to exclude the defendants from the group of persons entitled to any recovery").

For illustrative cases from other jurisdictions, see *Perlman v. Feldmann*, 219 F.2d 173 (2d Cir. 1955) (awarding individual recovery to minority stockholders where former controller and principal officer sold his control block in transaction that was held to constitute a breach of duty and where corporate recovery would result in greater total liability and permit culpable parties to benefit); *Rankin v. Frebank Co.,* 121 Cal. Rptr. 348 (Cal. Ct. App. 1975) (awarding *pro rata* recovery in suit involving misappropriation of corporate opportunity); *Holi-Rest, Inc. v. Treloar*, 217 N.W.2d 517 (Iowa 1974) (incorporating individual recovery for minority stockholder into remedy awarded in derivative action challenging controller's extraction of excessive salaries and loans from corporation as well as other self-dealing transactions); *Matthews v. Headley Chocolate Co.*, 100 A. 645 (Md. 1917) (awarding *pro rata* recovery to minority stockholders in derivative suit where controlling shareholders caused the corporation to pay themselves excessive salaries, then sold their control block to a new buyer); *Di Tomasso v. Loverro*,

- Cases where an entity-level recovery would benefit "guilty" stockholders, but an investor-level recovery could be more narrowly tailored to benefit only "innocent" stockholders.[73]

---

293 N.Y.S. 912 (N.Y. App. Div. 1937), *aff'd*, 12 N.E.2d 570 (N.Y. 1937) (per curiam) (awarding *pro rata* recovery to minority stockholder after directors conspired with competition); *Alexander v. Quality Leather Goods Corp.*, 269 N.Y.S. 499 (N.Y. Sup. Ct. 1934) (permitting minority stockholder to recover individually where corporation was dissolved, all creditors had been paid, and court could identify party who should benefit from judgment); *Joyce v. Congdon*, 195 P. 29 (Wash. 1921) (ordering *pro rata* award to minority in derivative suit challenging transaction in which corporation purchased stock with corporate funds then distributed shares to majority holders); *see also Jones v. Mo. Edison Elec. Co.*, 144 F. 765 (8th Cir. 1906) (explaining that trial court could award *pro rata* recovery in self-dealing transaction); *Backus v. Finkelstein*, 23 F.2d 357 (D. Minn. 1927) (ordering *pro rata* recovery where the defendants took excessive salaries, kept inadequate records, and used the corporation's credit for their own benefit); *Fougeray v. Cord*, 24 A. 499 (N.J. Ch. 1892) (ordering dividend paid to innocent shareholder), *rev'd on other grounds sub nom.*, *Laurel Springs Land Co. v. Fougeray*, 26 A. 886 (N.J. 1892) (directing payment of reasonable dividend); *Hyde Park Terrace Co. v. Jackson Bros. Realty Co.*, 146 N.Y.S. 1037 (N.Y. App. Div. 1914) (awarding *pro rata* recovery where defendants usurped payments directed towards company); *Von Au v. Magenheimer*, 110 N.Y.S. 629 (N.Y. App. Div. 1908) (permitting individual suit by stockholder where defendants took excessive salaries, refused to pay dividends, and committed waste as part of a successful attempt to induce plaintiff to sell shares), *aff'd*, 89 N.E. 1114 (N.Y. 1909); *Dill v. Johnston*, 179 P. 608 (Okla. 1919) (awarding *pro rata* recovery after majority stockholder converted assets for personal use); *Easton v Robinson*, 31 A. 1058 (R.I. 1895) (per curiam) (ordering *pro rata* recovery where majority stockholders, who were also directors, voted themselves excessive salaries); *Nichols v. Olivia Veneer Co.*, 246 P. 941 (Wash. 1926) (awarding *pro rata* distributions when some shareholders received excessive salaries); *Chounis v. Laing*, 23 S.E.2d 628 (W. Va. 1942) (awarding *pro rata* recovery for dissenting stockholders and not for the stockholders who voted in favor of challenged transaction); *Jenkins v. Bradley*, 80 N.W. 1025 (Wis. 1899) (directing *pro rata* recovery because other shareholders settled with company).

[73] 13 Fletcher, *supra*, § 6028, at 325 ("where corporate recovery would benefit shareholders who participated or acquiesced in the wrongdoing"); Grenier, *supra*, at 167 ("to limit recovery to 'innocent' shareholders"); Bruce, *supra*, at 536 n.79 ("where 'guilty' and 'innocent' stockholders would benefit by corporate recovery"); Situations, *supra*, at 1314 ("Where there are 'innocent' and 'guilty' stockholders, [courts] have occasionally employed individual awards to limit recovery to the 'innocent' ones.").

- Cases where the entity is no longer an independent going concern, such that channeling the recovery through the corporation is no longer feasible or a *pro rata* recovery is more efficient.[74]

---

For illustrative cases, see *Perlman v. Feldmann*, 219 F.2d 173 (2d Cir. 1955) (excluding from investor-level recovery stockholders who gained from the fruits of the wrongful act), *cert denied*, 349 U.S. 952 (1955); *Atkinson v. Marquart*, 541 P.2d 556 (Ariz. 1975) (en banc) (awarding individual recovery to one shareholder for a breach of fiduciary duty by the other shareholder); *Rankin v. Frebank Co.*, 121 Cal. Rptr. 348 (Cal. Ct. App. 1975) (awarding *pro rata* recovery where defendant misappropriated corporate assets); *Brown v. De Young*, 47 N.E. 863 (Ill. 1897) (excluding from recovery stockholders who participated in fraud); *Samia v. Cent. Oil Co. of Worcester*, 158 N.E.2d 469 (Mass. 1959) (directing forced sale of wrongdoers' equity to prevent unjust enrichment); *Harris v. Rogers*, 179 N.Y.S. 799 (N.Y. App. Ct. 1919) (ordering *pro rata* award to plaintiff because other shareholders acquired stock from culpable parties); *Ritchie v. People's Tel. Co.*, 119 N.W. 990 (S.D. 1909) (ordering dividend distributions to innocent shareholders until wrongdoer repaid the corporation for misappropriated funds); *Joyce v. Congdon*, 195 P. 29 (Wash. 1921) (ordering *pro rata* recovery although defendant was innocent but purchased stock from wrongdoers); *Chaunis v. Laing*, 23 S.E.2d 628 (W. Va. 1942) (excluding from recovery stockholders who settled separately with defendants); *Young v. Colum. Oil Co. of W. Va.*, 158 S.E. 678, 685 (W. Va. 1931) (awarding *pro rata* recovery after defendant directors usurped corporate opportunity); *Spaulding v. N. Milwaukee Town Site Co.*, 81 N.W. 1064 (Wis. 1900) (excluding from recovery stockholders who settled separately with defendants).

For a Delaware case suggesting a similar approach, see *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 82 (Del. Ch. 1999) (Strine, V.C.) (recognizing that the adoption of a rights plan would affect different types of stockholders differently and suggesting that characterizing the claim as derivative could prevent the defendants who were also stockholders from benefitting from their wrongdoing by "awarding relief to the class of innocent stockholders").

[74] 13 Fletcher, *supra*, § 6028, at 325 ("where the corporation has ceased doing business and direct recovery would facilitate the distribution of assets"); Berger, *supra*, at 820 (noting that cases have permitted individual stockholders to sue directly, rather than derivatively, after a corporation has been dissolved, "indicat[ing] judicial awareness of the need for a stockholders' suit when the corporation is unable to sue"); Grenier, *supra*, at 167 ("to provide a convenient method for ultimate distribution when the corporation is in liquidation or when its assets have been sold"); Bruce, *supra*, at 536 n.79 ("where the corporation is no longer a viable concern"); Situations, *supra*, at 1314 ("[W]here the

corporation is no longer a going concern, [courts] have allowed individual awards to facilitate distribution of the funds.").

For illustrative Delaware cases, see *Cencom*, 2000 WL 130629, at *5-6 (classifying claim as direct in part because of liquidation of partnership); *Fischer*, 1999 WL 1032768, at *3-4 (classifying claim as direct in part because of liquidation of corporation); *Abelow v. Symonds*, 156 A.2d 416, 420 (Del. Ch. 1959) ("I am not convinced that plaintiffs should be summarily denied the right to couch their complaint in terms which seek a remedy for alleged personal injury to a class of stockholders as opposed to the theoretical injury to a now dissolved corporate entity."); *Eshelman v. Keenan*, 194 A. 40, 43 (Del. Ch. 1937) (Wolcott, C.) (positing that circumstances could support a *pro rata* recovery, such as if "the corporation had ceased to operate, its controlling stockholder had converted all of its assets and it was denuded of all of its property"), *aff'd*, 2 A.2d 905 (Del. 1938). *See generally* Heyman & Enerio, *supra*, at 178-81) (positing the re-discovery of a "liquidation exception" under which investors could sue directly once an entity had liquidated or was in the process of liquidating and was distributing its assets to its equity holders).

For illustrative non-Delaware cases involving dissolution, see *May v. Midwest Refining Co.*, 121 F.2d 431 (1st Cir. 1941) (limiting relief to plaintiffs after directors engaged in fraud while liquidating company), *cert. denied*, 314 U.S. 668 (1941); *Am. Seating Co. v. Bullard*, 290 F. 896 (6th Cir. 1923) (affirming trial court decision to award plaintiffs' an interest in wrongfully transferred property); *Ervin v. Or. Ry. & Nav. Co.*, 20 F. 577 (C.C.S.D.N.Y. 1884) (awarding *pro rata* relief to minority shareholders of dissolved corporation where majority directors engaged in self-dealing transactions); *Ward v. Graham-Jones Motor Co.*, 219 P. 776 (Colo. 1923) (allowing direct suit where former shareholder of dissolved corporation showed directors' engaged in pre-dissolution fraud); *Geltman v. Levy*, 207 N.Y.S.2d 366 (N.Y. App. Div. 1960) (denying motion to dismiss where plaintiffs sought *pro rata* recovery after company was liquidated because defendant misappropriated corporate assets); *Alexander v. Quality Leather Goods Corp.*, 269 N.Y.S. 499 (N.Y. Sup. Ct. 1934) (ordering *pro rata* recovery where director-shareholders engaged in fraud in connection with dissolution of company); *Sale v. Ambler*, 6 A.2d 519 (Pa. 1939) (granting direct recovery to plaintiff when directors of dissolved company misappropriated corporate funds); *Bailey v. Jacobs*, 189 A. 320 (Pa. 1937) (granting direct payment to plaintiffs for liquidated but undissolved corporation); *Commonwealth Title Ins. & Tr. Co. v. Seltzer*, 76 A. 77 (Pa. 1910) (permitting stockholders to pursue an individual recovery involving assets of an undissolved corporation in liquidation); *Kingsbury v. Phillips*, 142 S.W. 73 (Tex. Civ. App. 1911) (granting plaintiffs right to pursue as direct claims that would otherwise be derivative after directors of dissolved corporation misappropriated corporate assets).

In considering whether to grant a *pro rata* recovery, courts also consider the rights of

parties having a higher priority in the capital structure, such as creditors.[75] "The ultimate

For illustrative non-Delaware cases involving mergers, see *Watson v. Button*, 235 F.2d 235 (9th Cir. 1956) (affirming award of *pro rata* recovery when defendant had embezzled funds in connection with a sale of all the company's stock); *Kirk v. First Nat'l Bank of Columbus*, 439 F.Supp. 1141 (M.D. Ga. 1977) (permitting stockholders of merged corporation to bring post-closing suit based on undiscovered pre-transaction breach of fiduciary by corporate president as a direct claim); *DeHaas v. Empire Petroleum Co.*, 300 F.Supp. 834 (D. Colo. 1969) (ordering equitable lien on post-merger corporation for benefit of stockholders of acquired company after finding liability under Rule 10b-5), *rev'd on other grounds*, 435 F.2d 1223 (10th Cir. 1970) (noting "we consider plaintiff's stock interest to be the practical equivalent of record stock and sufficient to satisfy the requirements of Rule 23.1(1)"); *Gertsle v. Gamble-Skogmo, Inc.*, 298 F.Supp. 66 (E.D.N.Y. 1969) (limiting award to stockholders of acquired company injured by misleading statements in proxy), *modified on other grounds*, 478 F.2d 1281 (2nd Cir. 1973); *Miller v. Steinbach*, 268 F.Supp. 255 (S.D.N.Y. 1967) (permitting derivative action brought under federal securities laws against the corporation's officers and directors to continue after a merger as an individual action with the possibility of a *pro rata* recovery); *Atkinson v. Marquart*, 541 P.2d 556 (Ariz. 1975) (en banc) (permitting direct suit by stockholder of dissolved corporation); *Gabhart v. Gabhart*, 370 N.E.2d 345 (Ind. 1977) (ruling that "a Court of Equity may grant relief, pro-rata, to a former shareholder, of a merged corporation, whose equity was adversely affected by the fraudulent act of an officer or director and whose means of redress otherwise would be cut off by the merger"); *Indep. Inv. Protective League v. Time, Inc.*, 412 N.Y.S.2d 898 (N.Y. App. Div. 1979) (permitting former stockholders of merged corporation to pursue claim for pre-merger mismanagement relating to issuance of stock as a post-closing direct claim brought on behalf of former corporation's stockholders); *Platt Corp. v. Platt*, 249 N.Y.S.2d 75 (N.Y. App. Div. 1964) (refusing to hold that derivative claims for breach of fiduciary duty were "obliterated by the merger of the wronged corporation into another corporation" and permitting the claims to be litigated as a direct action), *aff'd*, 204 N.E.2d 495 (N.Y. 1965); *see also Duffy v. Cross Country Indus., Inc.*, 395 N.Y.S.2d 852, 853 (N.Y. App. Div. 1977) ("[T]he cause of action that [plaintiff] would have against its officers and directors for self-dealing and corporate waste would survive the merger . . . .").

[75] *See, e.g.*, Berger, *supra*, at 823 ("The objection remains that individual stockholders' actions may deprive corporate creditors of protection [but] [i]n the absence of creditors, that objection should carry no weight."); Individual Recovery, *supra*, at 283

problem before the courts is how to protect the interests of all the parties involved: the corporation, its creditors and its shareholders." Individual Recovery, *supra*, at 284. *Pro rata* recovery can be "the most effective technique for dealing with the parties' varying equities." Booth, *supra*, at 1025 n.4 (quoting W. Cary & M. Eisenberg, *Cases & Materials on Corporations* 905 (5th ed. 1980)). If a court decides to grant an investor level recovery, then "[e]ach stockholder's award is computed by multiplying the sum which the corporation would have received had individual recovery not been allowed by the ratio of that stockholder's shares to the total number of shares outstanding." Situations, *supra*, at 1314.

Notably, courts at times have granted *pro rata* recoveries in derivative actions at the request of the defendants, who thereby could pay less in terms of the aggregate amount of damages.[76] In Delaware, defendants frequently use a variant of this approach

---

("The real objection to permitting a shareholder to recover directly for his proportionate share of the damage inflicted upon the corporation . . . [is] that the result of such recovery is a return of corporate assets to shareholders without first satisfying corporate creditors.").

[76] *See, e.g.*, *Eshelman*, 194 A. at 43-44 (rejecting request by defendants for an individual recovery that would reduce their aggregate liability); *De Young*, 47 N.E. at 865 (noting defendant's request that relief should be limited to non-assenting shareholders); *Headley Chocolate Co.*, 100 A. at 651 (explaining that it would not be fair to require defendants to pay back full amount to corporation); *Shanik v. Empire Power Corp.*, 58 N.Y.S.2d 176, 181-82 (N.Y. Sup. Ct. 1945) (noting that it would award proportionate recovery consistent with "defendants' plea that a decree be moulded consonant with the true equities"); *Congdon*, 195 P. at 30 (stating that the plaintiff complained that the recovery was to him personally and not the corporation); Personal Recovery, *supra*, at 321.

to settle derivative actions in exchange for some form of stockholder-level consideration, such as either a dividend to stockholders or a buyout to the minority. Examples include:

- Settlement Hearing, *In re Clear Channel Outdoor Hldgs. Inc., Deriv. Litig.*, Consol. C.A. No. 7315-CS (Del. Ch. Sept. 9, 2013). This case involved derivative claims alleging that the parent company of the nominal defendant caused the nominal defendant pre-IPO to loan the parent money on favorable, unsecured terms. Post-IPO, the loan balance continued to grow while the parent company's credit rating decreased. The complaint attacked the defendants' actions in approving the initial loan and allowing the loan balance to balloon. The defendants formed a Special Litigation Committee under *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981), evidencing their view that the claims were derivative. The case was settled by, among other things, having the nominal defendant demand partial repayment of the loan ($200 million) and pay a dividend in the same amount for stockholders. Then-Chancellor Strine approved the settlement, noting "[i]t's a derivative action, which is actually, if you think about it, a form of class action" and that "the dividend feature of it, the reduction of the outstanding amount [of the loan] plus the dividend out, in particular to the public stockholders, is a substantial benefit." *Id.* at 35, 38.

- Settlement Hearing, *Davis v. Holmes*, C.A. No. 638-N (Del. Ch. June 23, 2006). The plaintiffs claimed that the defendants violated their fiduciary duties to the nominal defendant, New Century Equity Holding Corp., by (i) operating New Century as an unregistered investment company, (ii) paying excessive compensation, (iii) selling substantially all of its assets, and (iv) engaging in self-dealing. The settlement included the creation of a $3.2 million fund that was distributed to New Century's unaffiliated stockholders. Vice Chancellor Lamb approved the settlement, observing that the claim was "really a derivative claim" but that the pass-through structure was a "very favorable outcome." *Id.* at 23.

- Settlement Hearing, *In re Freeport-McMoRan Copper & Gold Inc. Deriv. Litig.*, Consol. C.A. No. 8145-VCN (Del. Ch. Apr. 7, 2015). In this purely derivative case, the plaintiffs alleged that the members of the board of directors of nominal defendant Freeport-McMoRan Copper & Gold Inc. ("Freeport") caused Freeport to overpay to acquire a company in which the defendants had an interest. The defendants moved to dismiss pursuant to Rule 23.1, evidencing their view that the claims were derivative. While those motions were pending, the parties settled with the principal consideration consisting of a gross settlement fund of $147.5 million plus interest that was paid directly to Freeport stockholders as a special dividend.

- *Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018 (Del. Ch. Aug. 30, 2007). This action involved what was primarily a derivative suit challenging

arrangements between the nominal defendant and its majority stockholder regarding split-dollar life insurance policies on the life of the majority stockholder's relatives for which the nominal defendant paid the premiums but which the majority stockholder owned. The plaintiffs claimed that the nominal defendant suffered millions of dollars of damages. The defendants moved to dismiss, relying on derivative standing doctrines such as the continuous ownership requirement and the failure to make demand. *See Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *2 (Del. Ch. Oct. 19, 2006) (reciting procedural history). The case was settled by having the defendants make a tender offer to the minority and take the nominal defendant private. *Crowley*, 2007 WL 2495018, at *4. Only the stockholders who owned stock at the time of the tender offer—not those who held stock at the time of the alleged wrongs—were permitted to participate in the tender offer and receive the benefit of the settlement. *Id.* at 8 n.8. The minority stockholders thus received a remedy for a derivative claim that consisted of their *pro rata* share of the value of the corporation, including some value attributed to the derivative claim.

- Settlement Hearing, *Gerber v. EPE Hldgs. LLC*, C.A. Nos. 5989-VCN and 3543-VCN (Del. Ch. July 1, 2014). This settlement involved two actions. In the first action, the plaintiffs alleged a derivative claim for breach of fiduciary duty arising out of the nominal defendant's acquisition of a related party. In the second action, the plaintiffs alleged direct and double derivative claims alleging that a merger failed to compensate the plaintiffs for their extinguished derivative claims. Both cases were settled in exchange for a direct payment by the defendants to those investors who held units at the time of the merger.

These settlements demonstrate that when not arguing that a derivative claim should be extinguished after a merger, defense counsel understand that the functional and equitable equivalent of an entity-level recovery is an investor-level recovery in which the injured investors receive their *pro rata* share of the amount that otherwise would go to the entity.[77] There is nothing prejudicial to the defendants in recasting an entity-level

---

[77] Similar, albeit converse, reasoning justifies requiring the corporation to pay a fee award to class counsel when the class claims conferred benefits on all stockholders but did not create a common fund. *See In re First Interstate Bancorp Consol. S'holder*

recovery as an investor-level recovery. Indeed, the defendants typically benefit because they have to come up with less money to fund the recovery, and that reduced amount in turn supports a lower attorneys' fee award.

Applying these principles to the current case indicates that even while El Paso MLP continued as an independent entity, a *pro rata* recovery was possible. The Fall Dropdown was a transaction in which the party in control of the entity—the General Partner—extracted value at the expense of the Partnership, so an entity-level remedy would have benefitted the General Partner by preserving its control over the funds. The General Partner also would have received the benefit of the entity recovery through its ownership interest in the Partnership, so the entity-level remedy would have benefited the "guilty" as well as the "innocent." Faced with those factors, the court could have awarded an investor-level remedy, even accepting for purposes of analysis that Brinckerhoff described his claim as derivative for much of the litigation. Indeed, in his *Gaylord* decision, Chief Justice Strine, then a Vice Chancellor, questioned the propriety of awarding damages to the entity (and the resulting derivative characterization) where the alleged wrongdoers owned a significant stake in the entity. *See Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71 (Del. Ch. 1999) (Strine, V.C.). If the defendants were proven to be wrongdoers, he asked, "should [they] be entitled to recover damages for the economic injury they inflicted on themselves"? *Id.* at 80. He then reasoned, "If the

*Litig.*, 756 A.2d 353, 358 (Del. Ch. 1999); *Richman v. DeVal Aerodynamics Inc.*, 185 A.2d 884, 886 (Del. Ch. 1962).

answer is no because of the fact that they created the harm, this factor would support awarding relief to the class of innocent stockholders, not to the corporation." *Id.* The Chief Justice's sound reasoning could have applied to this case.

Before of the pre-Merger possibility of a *pro rata*, investor-level remedy, the General Partner cannot claim prejudice now if, after the Merger, this court implements the Liability Award through a *pro rata* recovery. If anything, the different form of award benefits the General Partner by calling for a lesser amount of total damages. The General Partner should prefer this result, as did the defendants in the precedent settlements who chose to use *pro rata* payments to resolve derivative claims.

**D.     The Resulting Award**

Because Brinckerhoff's claim for breach of the LP Agreement was not exclusively derivative, Brinckerhoff can continue to pursue it after the Merger and enforce the Liability Award. One means of enforcing the award would be to have KM Partners, as the successor to the General Partner, pay an amount equal to 58.6% of the $171 million, plus pre-and post-judgment interest through the date of payment, into a common fund administered by plaintiff's counsel. The 58.6% represents the aggregate partnership interest owned pre-Merger by limited partners unaffiliated with the General Partner, as disclosed in the Proxy Statement and in El Paso MLP's 10-Q dated October 24, 2014, two days after the Proxy Statement. Through a claims administration process, those limited partners can claim their *pro rata* share of the fund, net of any award of attorneys' fees and expenses approved by this court.

Alternatively, once any award of attorneys' fees and expenses has been quantified,

KM Partners can make a *pro rata* payment to the unaffiliated limited partners in El Paso MLP at the time of the Merger using the same method that its affiliates used to provide those limited partners with the consideration paid in the Merger. Kinder Morgan, or more accurately its transfer agent, necessarily knows the identities of those limited partners and their respective limited partnership interests, because Kinder Morgan previously sent them checks and shares. The same administrative procedure can be used to distribute each unaffiliated limited partner's *pro rata* share of the net amount of the Liability Award.

Setting aside the arguments that this decision already has addressed, the General Partner offers two objections to this remedy. The first is that the identities of the unaffiliated limited partners at the time of the Merger who will receive the award are not the same as the identities of the unaffiliated limited partners at the time of the Fall Dropdown, who were the limited partners whose contract rights were violated. That is true, but not an impediment to relief. The claim that any limited partner at the time of the Fall Dropdown had for breach of the LP Agreement arose out of that limited partner's status as a holder of common units and passed to that limited partner's successor when the partner sold its common units.[78] The owners of the common units at the time of the Merger therefore have the right to recover on the direct claim.

---

[78] *See Schultz v. Ginsburg*, 965 A.2d 661, 667-68 (Del. 2009); *In re Activision Blizzard, Inc. S'holder Litig.*, --- A.3d ---, 2015 WL 2438067, at *20-21 (Del. Ch. May 20, 2015).

The answer that the claims travel with the shares does not address the consequences of newly issued units, which admittedly complicate matters. Purchasers of newly issued units occupy a position somewhat analogous to the acquirer under the *Bangor Punta* doctrine. Recall that a buyer under the *Bangor Punta* doctrine is treated as having conducted due diligence, obtained confidential information, and secured representations from the sell-side managers about the value of the target company—or at least to have had the opportunity to do those things. The negotiated price that the acquirer pays for the entity, therefore, should fairly reflect what the business is worth. It is unlikely that the seller intends for the acquirer to buy the business and then assert what this decision has labeled Internal Claims, or that the acquirer negotiates based on its anticipated ability to recover on those claims. The *Bangor Punta* doctrine therefore bars an acquirer from re-trading its deal by pursuing those claims. By analogy to the *Bangor Punta* doctrine, if the purchasers of El Paso MLP's newly issued shares paid a price that reflected the value of El Paso MLP after the Fall Dropdown and did not include any prospect of a contingent recovery, then to allow them to participate now would give them a windfall.

In my view, there are important differences between a broad market issuance and a negotiated acquisition. From an informational standpoint, the purchasers of El Paso MLP's newly issued units were not in the same position as an acquirer under the *Bangor Punta* doctrine, nor is there reason to think that they eschewed participation in any recovery on pending or prospective Internal Claims. They did have access to the market price and El Paso MLP's SEC filings, and under the semi-strong version of the efficient

capital markets hypothesis, the market price of El Paso MLP should have reflected (to the extent of the information available) both (i) the loss in value to El Paso MLP resulting from the Fall Dropdown and (ii) the asset value of the contingent recovery that Brinckerhoff was pursuing.[79] Thus, unlike the acquirer under *Bangor Punta* who pays a negotiated price that does not incorporate the prospect of a contingent recovery on Internal Claims, the buyers of El Paso MLP's newly issued units paid a market price that did reflect the contingent prospect of participating in the potential recovery. Allowing those units to participate therefore does not confer a windfall but rather allows those holders to receive the payoff for an element of contingent value that they paid for when they purchased their units.

Admittedly it is not clear that the market would have priced fully and accurately either the harm that the Fall Dropdown caused or the value of the Liability Award. Much of this case was conducted within the confines of a confidentiality order, and the bulk of the information that the market received was from insiders who had natural and understandable reasons to discount the lawsuit's chances of success. Recognizing that litigants have preferential access to material information about a lawsuit that the market lacks, this court has restricted the ability of plaintiffs in representative actions to trade

---

[79] *See* J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement*, 33 Del. J. Corp. L. 673, 685 (2008). Recent empirical research suggests that the market does react to the filing of derivative actions in the Delaware Court of Chancery, particularly to lawsuits with indicia of higher quality. *See* Alan B. Badawi & Daniel Chen, The Shareholder Wealth Effects of Delaware Litigation 24 (Sept. 5, 2015) (working paper).

while a case is pending. *See Steinhardt v Howard-Anderson*, 2012 WL 29340, at \*8-9 (Del. Ch. Jan. 6, 2012) (collecting cases). In addition, the Post-Trial Opinion found that the General Partner and El Paso Parent did not provide clear or accurate pricing information about the components of the Fall Dropdown. For cosmetic reasons, they only disclosed the aggregate price paid in the Fall Dropdown. *See* Post-Trial Opinion at 13 ("Neither El Paso MLP nor Parent ever announced the price breakdown, only an aggregate price. Parent made the decision to present the Fall Dropdown as a unitary transaction. . . . The Committee members understood that aggregating the price helped Parent and was done for cosmetic reasons.").

Given these factors, it seems likely some of the holders of El Paso MLP units at the time of the Merger either paid relatively too much or relatively too little, and that what they will receive as their share of a *pro rata* recovery is therefore slightly more or slightly less than what an infallible and perfect system of justice would award. From the standpoint of dilution, the same issue exists to a much greater degree under *Lambrecht v. O'Neal*, where the Delaware Supreme Court held that after a stock-for-stock merger, a stockholder of the target corporation who received stock in the merger had standing to bring a double-derivative claim on behalf of the post-transaction entity. *See* 3 A.3d 277, 286 (Del. 2010). As Chief Justice Strine observed while a Vice Chancellor, "a recovery on behalf of the [post-transaction entity], which will be owned only [by a fraction of the] current stockholders, is not the same as a recovery on behalf of the current . . . stockholders alone." *In re Massey Energy Co.*, 2011 WL 2176479, at \*30 (Del. Ch. May 31, 2011).

In short, while the General Partner raises a fair point about the implications of newly issued units, that objection provides at most a reason to regard a *pro rata* award as less than perfect. In my view, it is not a reason to deny relief altogether and confer what would be an unconscionable windfall on the General Partner and its affiliates. As humans, we can only strive for the best possible result, recognizing that we inevitably fall short of what the divine could accomplish.

The General Partner's other objection is that to the extent this court awards a *pro rata* remedy, it must assume that El Paso MLP paid $171 million less in the Fall Dropdown, making that amount available for potential distribution, then determine how much of that amount would have flowed to the unaffiliated limited partners through the distribution provisions of the LP Agreement. That would be one way to calculate damages, but when a merger has intervened, it is not the only way.

If El Paso MLP had continued as an independent entity, then the limited partners would have received returns in the form of distributions, and a portion of any entity-level recovery on the Liability Award eventually would have reached the limited partners in that form. Once the defendants engaged in the Merger, however, the calculus changed. At this point, the court can assume that the Merger consideration fairly valued the bundles of rights held by the holders of common units at the time of the Merger, except for their share of the claim for the breach of the LP Agreement. Because the only right left to be valued is the entitlement to a *pro rata* share of the $171 million, plus interest, the court can award the limited partners their *pro rata* share of that asset.

## III.    CONCLUSION

The Post-Trial Opinion held that the General Partner was liable for breach of contract in connection with the Fall Dropdown. The Liability Award determined that the amount of damages that the General Partner inflicted on the Partnership through the Fall Dropdown was $171 million. In light of the Merger, the Liability Award will be implemented through an order requiring the General Partner to pay each unaffiliated limited partner at the time of the Merger their *pro rata* share of the Liability Award, plus pre- and post-judgment interest through the date of payment, less an amount for a reasonable award of attorneys' fees and expenses.

| Ownership | Description | Source |
|---|---|---|
| 4,758,190 | Total number of GP Units | El Paso MLP 10-Q, dated as of Oct. 24, 2014. |
| 93,380,734 | Common units held by Kinder Morgan and its affiliates | Proxy Statement at 99. |
| 353,732 | Common units held by El Paso GP Directors | Proxy Statement at 99. |
| 139,416,863 | Common units held by unaffiliated investors | Total common units – Common units held by Kinder Morgan and its affiliates – Common units held by El Paso GP Directors |
| 233,151,329 | Total common units | El Paso MLP 8-K, dated as of November 20, 2014, at 1 and El Paso MLP 10-Q, dated as of Oct. 24, 2014. |
| 237,909,519 | Total units | Total common units + Total number of GP units |
| 2.00% | GP percentage ownership | Total number of GP units ÷ Total units |
| 59.80% | Percentage of common units held by unaffiliated investors | Common units held by unaffiliated investors ÷ Total common units |
| 58.60% | Percentage of total units held by unaffiliated investors | Common units held by unaffiliated investors ÷ Total units |
| 40.20% | Percentage of common units held by Kinder Morgan, its affiliates, and El Paso GP Directors | (Common units held by Kinder Morgan and its affiliates + Common units held by El Paso GP Directors) ÷ Total common units |
| 41.40% | Percentage of total units held by Kinder Morgan, its affiliates, and El Paso GP Directors | (Common units held by Kinder Morgan and its affiliates + Common units held by El Paso GP Directors + Total number of GP Units) ÷ Total units |
| 40.05% | Percentage of total common units held by Kinder Morgan, its affiliates, and El Paso GP Directors | Common units held by Kinder Morgan and its affiliates ÷ total common units |